# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| T.B., a minor, by and through his parent and natural guardian, Ashley Bursch, Jquan Fuller-Rueschman, by and through his guardians, David and Dennis Fuller-Rueschman, D.S., a minor, by and through his parent and natural guardian, Latrice Williams, F.B., a minor, by and through her parent and natural guardian, Tonya Coleman, D.J., a minor by and through her parents and natural guardians, Juanedra Jenkins and Latrone Woods, and Z.P., a minor, by and through his parents and natural guardians, Amanda and Jason Peterson, | Case No. |

Plaintiffs,

v.

**COMPLAINT
(JURY TRIAL DEMANDED)**

Independent School District 112, a/k/a
Eastern Carver County Schools,

Defendant.

This is a civil rights case brought by African-American students against Independent School District 112 ("Defendant," or "ISD 112"). Racism has permeated ISD 112 for years. African-American students have been called "monkey," told they "don't belong," physically assaulted, racially profiled, and even threatened to be killed because of their skin color. And throughout all of this, ISD 112 has turned a blind eye and failed to meaningfully address the racism once and for all. As a result, African-American students in ISD 112 have suffered emotional trauma and substantial disruption to their education,

and several have left the district out of fear for their physical, personal, and educational well-being.

Now, Plaintiffs—current and former African-American students in ISD 112—by and through their parents and attorneys, bring this action against Defendant for violations of their rights under Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d, the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.03 *et seq*., and their right to equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983.[1]

## JURISDICTION AND VENUE

1.      Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

2.      This action arises under the Fourteenth Amendment of the United States Constitution; 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d; and the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.03 *et seq*.

3.      This Court has jurisdiction to hear this Complaint and to adjudicate the claims stated herein pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States.

4.      This Court also has supplemental jurisdiction with respect to claims arising

---

[1] Plaintiffs are African American or biracial. For ease of reference, the Complaint uses the terms "African American."

2

under state law pursuant to 28 U.S.C. § 1367.

5.      This Court has personal jurisdiction over Defendant because Defendant IDS 112 is a public agency of the State of Minnesota with its headquarters and activities located in Carver County, Minnesota.

6.      Venue is proper in this district under 28 U.S.C. § 1391 because the unlawful practices described herein have been committed in ISD 112 of Minnesota, the student records relevant to those practices are maintained and administered at the offices of the ISD 112, and Defendant resides in Carver County, Minnesota.

## PARTIES

7.      Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

8.      T.B., a minor, by and through his parent and natural guardian Ashley Bursch, attended Chaska Middle School East from approximately September 2016 until June 2019, and is currently in ninth grade. T.B. is African American.

9.      Jquan Fuller-Rueschman, by and through his guardians, David and Dennis Fuller-Rueschman, is an adult who attended Chaska High School from approximately September 2013 to October 2018.  Jquan is African American.

10.     F.B., a minor, by and through her parent and natural guardian Tonya Coleman, attended Chaska High School from approximately 2015 – 2019. F.B. is African American.

11.     D.J., a minor, by and through her parents Juanedra Jenkins and Latrone Woods, attended Chaska High School from September 2018 through present. D.J. is

African American.

12.     D.S., a minor, by and through his parent Latrice Williams, attended Chaska High School from September 2017 through the present. D.S. is African American.

13.     Z.P., a minor, by and through his parents Amanda and Jason Peterson, attended Bluff Creek Elementary from approximately September 2018 until June 2019. Z.P. is African American.

14.     Defendant ISD 112 a/k/a Eastern Carver County Schools is a public agency of the State of Minnesota with its headquarters and activities located in Carver County, Minnesota. Defendant has a registered office of 11 Peavey Road, Chaska, MN  55318.

15.     ISD 112 is comprised of 17 schools within ISD 112; 9 elementary schools, 3 middle schools, 2 high schools, and 2 special focus schools.

16.     ISD 112 is largely a racially homogenous district.

17.     According to the Office of Civil Rights' most recent data collection (2015), Black/African-American students only comprised 3.3% of the student population at ISD 112.[2]

18.     Approximately 8% of district staff are racial minorities.[3]

19.     There are no African-American teachers in District 112, and until July 2019, there were no African-American administrators in District 112.

---

[2] Office of Civil Rights Data Collection, Eastern Carver County Public School, available at https://ocrdata.ed.gov/Page?t=d&eid=33062&syk=8&pid=2278 (last visited September 3, 2019).
[3] Residents Organizing Against Racism, *FAQS*, available at https://www.roar112.com/faqs (last visited on August 30, 2019).

20.     Approximately one-third of minority staff have left the district in the past two years.[4]

21.     The following individuals, though not parties, work or worked for Defendant ISD 112:

  a.  Clint Christopher is the Superintendent of ISD 112 and has held this position since July 2017.

  b.  Prior to Clint Christopher, Jim Bauck was Superintendent of ISD 112.

  c.  Susana DeLeon is a Dean of Students of Chaska High School and held this position during the relevant time period.

  d.  Chuck Nelson is a Dean of Students of Chaska High School and held this position during the relevant time period.

  e.  James Bach is the Principal of Chaska High School and held this position during the relevant time period.

  f.  Kathy Fontes is an Assistant Principal for Chaska High School and held this position during the relevant time period.

  g.  Jonathan Summer is an Assistant Principal for Chaska High School and held this position during the relevant time period.

  h.  Madeleine Arenas is the Intercultural Specialist of Chaska High School and held this position during the relevant time period.

  i.  Beth Holm is the Principal of Chaska Middle School East and held this

---

[4] Id.

position during the relevant time period.

j.  Andrew Gilbert is the Assistant Principal of Chaska Middle School East and held this position during the relevant time period.

k.  Joan MacDonald is the Principal of Bluff Creek Elementary and held this position during the relevant time period.

l.  Michelle Cuka is a Special Education Supervisor for Eastern Carver County Schools and held this position during the relevant time period.

m. Jennifer Bishop is a special education teacher for Eastern Carver County Schools and held this position during the relevant time period.

## FACTUAL BACKGROUND

**I.  Systemic Race Discrimination Plagues the District, and Defendant has Ignored the Problem and Failed to Take Adequate Steps to Address It.**

22.  Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

23.  Racism has permeated ISD 112 for years.

24.  Defendant's deliberate indifference to repeated discrimination complaints has emboldened racist behavior within the district.

25.  In fact, during the 2018-2019 school year alone, ISD 112 made media headlines on numerous occasions for racially charged incidents:

- In September 2018, Defendant admitted white students to a Chaska High School football game while in **blackface,** and one student wore an Afro wig. Defendant did not communicate with parents of African-American students about the racist incident until *after* the photos hit media.

6

- In December 2018, an African-American middle school student discovered that white students had stolen his gym shirt, written the **"N word"** on the shirt in three places, and stuffed it back in his locker for him to find.[5]

- In February 2019, a picture of two white students wearing a charcoal cosmetic mask and using a racist hashtag, "**#blackface**" went viral on social media.

- In February 2019, Defendant refused to allow African-American students to display several of their Black History month poster themes because they were too "controversial;" whereas, white students were allowed to carry "**all lives matter**" signs under the guise of free speech.

- In April 2019, white students posted an image on Snapchat with 25 African-American students' faces superimposed on Google Maps and imaged with the red locater labeled "**Negro Hill.**"

- In May 2019, Defendant allowed a picture of a white student wearing **blackface** to be printed in the Chaska High School yearbook.

26.     Unfortunately, the racist conduct Plaintiffs experienced is not limited to these media-covered events.

27.     Among other incidents, on multiple occasions, Plaintiffs have been called "monkey," told they "don't belong," physically assaulted, racially profiled, and subjected to viewpoint discrimination and censorship because of their skin color—all of this while attending ISD 112 schools.

28.     What is more, in February 2019, a white student threatened to shoot a list of students, including African-American students, if they attended a school assembly at

---

[5] This Complaint refers to the "N word" where the actual word used by white students or administrators was "nigger."

Chaska High School relating to race relations. Notably, while making the threats via Snapchat, the student was holding a gun.

29.     School staff have little, if any, proper training or experience with respect to properly responding to reports of racism.

30.     Administrators have admitted to students that white teachers in the district do not know what they are doing with respect to racial issues.

31.     The principal of Chaska High School has admitted to not knowing whether the teachers have Black History Month curriculum and has placed the burden on African-American students to find a way to educate and celebrate Black History.

32.     Although ISD 112 promised training on racial issues prior to the 2019-2020 school year commencing, its most recent representation regarding efforts to address racism, as discussed below with respect to the district's August 30, 2019 letter to Minnesota Attorney General Keith Ellison, demonstrates serious shortcomings.

33.     Teachers and administrators routinely bear witness to white students discriminating against African-American students.

34.     Teachers are present when slurs are used against African-American students, administrators are informed of racist behavior, including physical assault, and parents routinely escalate racist incidents to deans, principals, and the superintendent. Yet, Defendant has failed to take meaningful action.

35.     White students do not suffer meaningful consequences for their actions and, instead, have been given escorts to protect themselves from being targeted by the African-American students they victimized.

36.     Teachers and administrators publicly single out African-American students who are targeted by white students, forcing African-American students to separate from the class as a result of discrimination.

37.     When called to school offices to discuss race discrimination, African-American students have been written up by the district for truancy.

38.     African-American students, in general, are disciplined at a far higher rate than their white peers at ISD 112:

| The Office of Civil Rights Survey Data (Survey Year: 2015)[6] | | | |
|---|---|---|---|
| School | % of Student Population that is Black or African American | % of In-School Suspensions of Black or African-American Students | % of Out-of-School Suspensions of Black or African-American Students |
| ISD 112 | 3.3% | 19.8% | 12.9% |
| Bluff Creek Elementary | .3% | No data | No data |
| Chaska Middle School West | 3.2% | 18.2% | 0 |
| Chaska Middle School East | 1.4% | 8.0% | 0 |
| Chaska High School | 4.7% | 30.0% | 27.3% |
| Clover Ridge Elementary School | 6.1% | No data | 100% |

---

[6]     Office of Civil Rights Data Collection, available at https://ocrdata.ed.gov/DistrictSchoolSearch#districtSearch (last visited September 3, 2019).

| | | | |
|---|---|---|---|
| Pioneer Ridge Middle School | 4.3% | 8.7% | 33.3% |

39.     Often times, complaints of discrimination are simply met by silence. For example, in February 2019, an African-American student presented Principal Bach with an image of white Chaska High School ("CHS") students in blackface, which white CHS students had shared on social media. The student told Principal Bach they were very troubled by this photo. Afterall, this was the second blackface incident in five months within the district. Principal Bach responded something to the effect of, "Where is this? Can this go viral? Did they use the CHS hashtags?" Thereafter, thirteen African-American students met with Principal Bach, Dean Susana DeLeon, and the Intercultural Specialist Madeleine Arenas to discuss the issue at the students' request. Despite repeated stories of discriminatory conduct the students had encountered while in the district, Principal Bach and the administrators expressed little sympathy.

40.     The district also discriminates against African-American students with respect to certain viewpoints. For example, ISD 112 adminstration has applauded white students for "taking the initiative to advocate for school safety" when they organized a school walk-in regarding school gun violence and has permitted them to carry around "all lives matter" signs. In contrast, African-American students have been prohibited posting "Black Lives Matter" signs and materials featuring African-American leaders during Black History Month.

41.     At school board meetings, too, ISD 112 is informed of the racist culture that has existed for years throughout the district's schools and continues to exist to this day.

42.     In fact, at a school board meeting on April 22, 2019, one parent read a letter from his African-American son, a 2011 Chaska High School graduate, who wanted to be heard in light of all of the recent racially charged events in the district. The Chaska High School alum wrote in part something to the effect of, "Race was always an issue for me in District 112." That student's father stated during the board meeting that his son frequently experienced racism in high school, including white students commenting on his hair, telling him racist jokes, asking why he didn't "talk like a thug" and staging a "fake gang fight."

43.     Media, too, informs ISD 112 of the persistent racism within its schools. For example, a local media outlet published a story on April 19, 2019, with the opening paragraph stating "Chaska, it happened again. Another racially charged incident in Eastern Carver County Public Schools."

44.     Remarkably, as of at least June 2019, ISD 112 did not have an anti-racism policy, and its current nondiscrimination and anti-harassment notice indicates it has not been revised since October of 2017.

45.     Until recently, ISD 112 had no equity and inclusion director.

46.     Only in response to community outrage and considerable recent media coverage did ISD 112 hire their first equity and inclusion director.

47.     Notably, ISD 112 does not dispute the rampant racism within its schools, but nonetheless, has failed and continues to fail to take any meaningful action to protect its African-American students and eliminate the substantial disruption to their education.

48.     In fact, as discussed below, four out of the six Plaintiffs left the district because of the rampant racism and ISD 112's failure to remediate.

11

49.     In June 2019, Defendant's superintendent Clint Christopher acknowledged ISD 112 has racial equity issues and that ISD 112 "didn't meet the standard" when addressing past incidents.

50.     Plaintiffs have suffered and continue to suffer emotional trauma as a result of Defendant's conduct.

51.     To date, Defendant has not taken any meaningful action to address the systemic racism that permeates its schools.

II.     ***Defendant has Allowed Discrimination to Exist and Continue against Plaintiffs and their Parents and has Ignored the Problem and Failed to Take Adequate Steps to Address It.***

    A.  **Chaska Middle School East**

***T.B. – Former Student***

52.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

53.     For the past three years, T.B. has endured race discrimination at the hands of his white peers while at school in ISD 112.

54.     T.B.'s mom, Ashley Bursch, has made repeated complaints of discrimination to administration but no meaningful steps were taken to address the discrimination her son repeatedly endured.

55.     Throughout his time in ISD 112, white students have kicked T.B. in the knees and called him "monkey," among other racial slurs. This occurred at school and on the bus.

56.     In addition to being called "monkey," his white peers often drew the word "monkey" on his school folders and, on more than one occasion, placed an object with a

picture of a monkey on his desk.

57.     Additionally, when a teacher's toddler was visiting the class, white students instructed the toddler to draw a monkey on the board, during which they all laughed and looked at T.B.

58.     White students have repeatedly told T.B. that his dad is a drug dealer or rapper, saying that is what all black dads are.

59.     On one occasion during the 2018-2019 school year, T.B. was looking at a white student's computer and the student told him to stop and proceeded to grab the collar of his shirt.

60.     She pulled so hard that she ripped the collar of his shirt, creating a gaping hole along the seam.

61.     Assistant Principal Gilbert called Ms. Bursch at the end of the day regarding the incident.

62.     Assistant Principal Gilbert attempted to minimize the situation by stating that the student that did this was a good student and then asked Ms. Bursch what she thought her punishment should be.

63.     Ms. Bursch was taken back by this question and told Assistant Principal Gilbert that it was not her job to determine what the fitting punishment should be. She stated that she expected that the student would get the same punishment her son would have received if he had ripped her shirt.

64.     On another occasion a white student intentionally smashed T.B.'s Chromebook, an incident that was recorded by school cameras.

65.    At one point, white kids were bullying T.B. by telling him that he stinks. They were doing this in class. When T.B. reported the bullying to his teacher, his teacher punished him by making him sit in the hallway. No meaningful action was taken against the bullies. T.B., then very upset, called his mom from the hallway.

66.    In light of the foregoing, T.B.'s mom, Ashley Bursch, has repeatedly contacted Assistant Principal Gilbert via email and phone regarding the above events. While Assistant Principal Gilbert spoke with Ms. Bursch and placed the burden on her to come up with solutions, neither he nor anyone else at ISD 112 took meaningful action to remedy the racism or alter the district's racist culture. Ms. Bursch's father in-law, too, spoke with the school, but nothing was done to protect T.B.

67.    Rather, the racist conduct continued to escalate.

68.    In December 2018, T.B. went to his school locker. Upon opening his locker T.B. discovered that students had stolen his gym shirt, written the "N word" in purple ink on his gym t-shirt on three separate spots, and returned it to his locker.

69.    Later, T.B. also discovered that students had also written the "N word" and the phrase "leave now" on the inside of his t-shirt.

70.    T.B. was horrified by what he found. Embarrassed and worried about the cost of a new t-shirt, he put the t-shirt on and put a sweatshirt over it. On his way to class, still disturbed by the events, he kicked an apple core. His gym teacher saw this and spoke with T.B. about his behavior.

71.    T.B. then went to talk to Assistant Principal Gilbert, who merely provided T.B. with a new gym shirt.

14

72.     Assistant Principal Gilbert emailed Ms. Bursch later in the day. The email focused on T.B. kicking the apple core and, at the end, concluded with a mere reference to the shirt, spelling out the entire slur.

73.     Given the Assistant Principal Gilbert's inadequate and offensive email and the district's lack of meaningful action, Ms. Bursch posted about the event on Facebook, including text of Assistant Principal Gilbert's email.

74.     The post went viral, prompting Assistant Principal Gilbert to reach out to Ms. Bursch at approximately 10 p.m. via email. While he apologized, neither he nor anyone else at ISD 112 took meaningful action to address the situation.

75.     Rather, the district decided to involve the police, who attempted to question T.B. about whether he had made up the entire incident.

76.     Notably, prior to the t-shirt incident, T.B.'s gym teacher told the class the "N word" was the equivalent of saying "retarded" and therefore should not be said.

77.     T.B. spoke up in front of the class and told his teacher that the "N word" is not the equivalent of saying "retarded" because there is a history associated with the "N word" that is not the same for the word "retarded." T.B.'s concerns were simply dismissed.

78.     Following the racist slur on her son's jersey, Ms. Bursch requested a copy of T.B.'s records from the school. When she received the records, she realized the district had changed her son's IEP without her consent.

79.     Specifically, the school added notes about alleged behavior issues her son had, none of which were previously raised to Ms. Bursch.

80.     Notably, the school later admitted they in fact did change T.B.'s IEP without

parental consent.

81.     Ms. Bursch then attended a meeting with a panel of Defendant's employees, including but not limited to Superintendent Clint Christopher and Assistant Principal Gilbert.

82.     Notably, prior to this meeting the equity coordinator was not involved in any of the other prior events and had had no contact with the Bursch family. At the meeting, she appeared to be doodling and not paying attention and, when called out on it, admitted to not knowing the Bursch family despite all T.B. had been through at ISD 112.

83.     Ms. Bursch told the school she would not allow T.B. back to school until they had a plan in place where she knew he would be safe.

84.     T.B. was out of school for about six weeks.

85.     Unfortunately, when T.B. returned students were still calling other African-American students the "N word" and racist conduct was alive and well.

86.     Rather than impose discipline that would deter and put an end to the racist behavior, ISD 112 acted to protect white students. One white student, who T.B. believes called an African-American female student the "N word," was given an escort at school to protect him.

87.     Later, T.B. was in a physical altercation with that student and was suspended for a day.

88.     T.B. was held to the ground by school staff while the white student was not similarly restrained.

89.     Following this altercation, the white student sent T.B. threatening messages

on social media. Ms. Bursch sent copies of the messages to Principal Holm but does not believe the district took take any meaningful action to address the situation.

90.     As a result of the foregoing, T.B.'s mental health has worsened, his outlook on race relations has changed, and his fear and unease has increased.

91.     Because of the repeated racist conduct and the district's repeated failure to meaningfully address it, T.B. and his two siblings will not be returning to ISD 112 for the 2019-2020 school year.

### B. **Chaska High School**

*Jquan Fuller-Rueschman – Former Student*

92.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

93.     Jquan Fuller-Rueschman was a student in ISD 112 from sixth grade until about October 2018 when he transferred to Southwest Metro Intermediate District 288.

94.      Jquan endured race discrimination at the hands of his white peers while at school in ISD 112.

95.     Jquan's parents, David and Dennis Fuller-Rueschman, made repeated complaints of discrimination to administration, but no meaningful steps were taken to address the discrimination their son repeatedly endured.

96.     Jquan was also penalized for responding to the racist behavior and on occasion, labeled "aggressive" and suspended after confronting a student who repeatedly called him the "N word."

97.     The district treated the repeated incidents of discrimination as isolated issues,

and in some circumstances, attempted to shift the blame to Jquan for reacting to the discriminatory conduct he endured.

98.    While attending school at Pioneer Ridge Middle School, Jquan was:

- Punched in the face on the school bus by a white student.

- Called the "N word" among other derogatory names.

- Accused of being stupid and dumb.

- Subjected to additional assaults where white students threw food at him and shot rubber bands at the back of his head.

99.    Jquan's parents became aware of the bullying at the dinner table when Jquan would describe his day.

100.    Jquan has autism and had difficulty reconciling why students were treating him this way.

101.    As the bullying escalated, Jquan also shared the incidents with his parents via text message and phone calls during the school day.

102.    Jquan became moody, depressed, and isolated himself at home and on the bus.

103.    Jquan also became scared to attend school.

104.    Jquan's parents reported the discrimination to Principal Dana Miller and Superintendent Bauch, among other administrators on multiple occasions.

105.    Unfortunately, the bullying continued and only got worse when Jquan attended Chaska High School.

106.    By way of example:

18

- Jquan was repeatedly poked in the back with pencils by white students during the lunch hour, often leaving a hole in his shirt. It got so bad that he started wearing hoodies to school because they were thicker.

- White students repeatedly stole personal items out of Jquan's backpack, including food and money.

- In tenth and eleventh grade, other students would pull Jquan's chair out from under him at lunch. It got so bad that administration directed Jquan to eat by himself in the "Purple House" to prevent this from happening.

- Other students called Jquan the "N word," "Nigga," "Fag," and "Bitch" on multiple occasions.

- Students scratched Jquan's car with a razor at school and threw eggs on his vehicle on multiple occasions at his home.

107.    Additionally, Jquan was a member of the Chaska High School football team and was bullied by several of the senior varsity teammates.

108.    For example, in October 2016, a white football player stated something to the effect of "I'll bring a gun to shoot you Jquan."

109.    In the same conversation, another white teammate said something to the effect of "what will you bring Jquan, a katana?"

110.    When Jquan reported the gun incident to Coach Dahl, Dahl said something to the effect of "all the drama seems to involve you."

111.    At a game at Clover Ridge, a white teammate kept shoving grass down Jquan's shoes while on the bench. Jquan asked him to stop and when he wouldn't, Jquan pushed him away and he fell to the ground.

112.    When Jquan tried to apologize, the student said something to the effect of "don't fucking touch me you fucking bitch."

19

113.    Jquan and his parents reported the bullying and discriminatory behavior to Coach Dahl repeatedly, but Dahl took no meaningful action to address it.

114.    Coach Dahl merely had conversations with the students bullying Jquan, and those students suffered no meaningful consequences for their horrendous conduct.

115.    Following Coach Dahl's conversations with the other players, things actually got worse for Jquan.

116.    Teammates began to call Jquan. a "snitch" and continued to terrorize him to the point where Jquan  had no other option than to quit the football team out of fear for his safety.

117.    Jquan and his parents escalated their report to Athletic Director Jon Summer, Principal Bach, and then-Superintendent Bauch.

118.    Despite their earlier prior complaints to Coach Dahl, Director Summer stated he allegedly had no prior knowledge of this behavior.

119.    The conduct got so bad that in September 2018, David Fuller-Rueschman reached out to administration expressing concern of Jquan's safety at Chaska High School.

120.    Michelle Cuka, head of Special Education, Principal Bach, and Jquan's school case manager, Jennifer Bishop, were present at this meeting.

121.    Bishop wrongly said Jquan's parents were not his legal guardians and proceeded to ask Jquan what he wanted.

122.    Jquan said something to the effect of "I don't feel safe here. I want out of here."

123.    Cuka asked what Jquan and his parents' concerns were and David Fuller-

Rueschman explained Jquan wanted to leave because of all of the bullying and discriminatory behavior.

124.    Principal Bach slammed his fist down on the table and shouted, "Prove it!"

125.    After this discouraging meeting, Jquan's parents kept him home until he was admitted to Southwest Metro.

126.    Still, Jquan's face was one of the twenty-five student faces superimposed on the Google map labeled "Negro Hill" by white Chaska High School students.

**D.S. – Current Student**

127.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein

128.    D.S. is an African-American student who completed his sophomore year during the 2018-2019 school year at Chaska High School.

129.    While D.S. experienced racism throughout his time at Chaska High School, everything escalated during the 2018-2019 school year.

130.    For example, in February 2019, a white student went around school threatening to shoot students at a school assembly the next day. The student then posted the threat on Snapchat where he listed a group of students, including African-American students and threatened to kill them if such students attended a school assembly at Chaska High School regarding race relations. Notably, in the post, he had a gun on his lap.

131.    That day, D.S., like many other African-American students stayed home out of fear for their safety. His mom called the school to excuse D.S. the day of the assembly and the school staff member said something to the effect of, "so your excusing your kid

too?" implying that several other parents had done the same too.

132.    D.S. also participated in the peaceful protest for "Black History Uncensored" that took place at Chaska High School on March 1, 2019. He witnessed a group of white students at the end of the hallway holding "All lives matter" signs and taunting the African-American students.

133.    A school staff member simply told D.S. to ignore the other kids because they were being "assholes," but the district did nothing to reprimand the white students for their behavior.

134.    Following the "Black History Uncensored" protest, D.S. became aware that two Chaska High School students circulated a picture of themselves on Snapchat with a charcoal face mask using the hashtag "#Blackface."

135.    Several students expressed their concern regarding the post, to which the two white students in question responded something to the effect of "It's just a joke," and then used the "N word" in reference to the students.

136.    What is more, D.S. was one of the twenty-five African-American students whose face was superimposed on a Google map labeled "Negro Hill" and circulated on social media by two white classmates.

137.    D.S. first learned about the racist act when he was sitting in class and was called down to the office over the Public Announcement system.

138.    When he arrived, school staff told the two white students to apologize, but then put the targeted African-American students on the spot by asking them to explain how the post made them feel.

139.    The two white students who created this racist post suffered no meaningful consequences as they continued to be present at school.

140.    On April 20, 2019, D.S. provided an interview with a Kare11 reporter regarding the incident and expressed his shock and discouragement.

141.    He further expressed that he believes many students at Chaska High School do not like black people and that the racism is not going to stop.

142.    Following this interview, the police showed up at D.S.'s home regarding his personal Snapchat picture, which showed a photoshopped image of D.S. on a rapper's photo with a gun. It was clear D.S. himself was not holding a gun and D.S. raps in his spare time.

143.    On information and belief, a parent notified Principal Bach regarding the allegedly threatening photo. Even though Principal Bach determined there was no such threat, he contacted Chaska police, which terrified Ms. Williams because she then thought that her son might be in legal trouble.

144.    The police also determined there was no threat.

145.    Ms. Williams reached out to Mr. Bach multiple times throughout the 2018-2019 school year.

146.    For example, Ms. Williams called Mr. Bach regarding the Negro Hill incident after learning about it from the media, not school.

147.    Ms. Williams also reached out to Mr. Bach after he called her son to the office to face the student perpetrators who placed his picture on the Negro Hill photo and explained to him how inappropriate that was.

23

148.    Despite her efforts, Ms. Williams only received excuses from Mr. Bach and no meaningful was taken to address the serious events in question.

149.    In light of the hostile environment, D.S. began calling his mom during the school day to come pick him up because he did not feel well.

150.    Because of the severe and pervasive discrimination, D.S. no longer wants to go to school and does not feel welcome.

### F.B. – Former Student

151.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

152.    F.B. has attended school at ISD 112 since the fourth grade and completed her sophomore year at Chaska High School in June 2019.

153.    F.B.'s high school experience has been filled with trauma associated with ISD 112's failure to address racism and protect its African-American students. While attending Chaska High School, F.B. has been targeted as an African-American student, racially profiled, and has endured hostility because of her race.  Specifically, ISD 112 has failed to address the hostile incidents described above, has subjected F.B. to viewpoint discrimination, has questioned her integrity, and has ignored her mental health concerns.

154.    During the 2018-2019 school year, F.B. experienced the escalating racial tension among students in the district, especially following the racially charged incidents that occurred in the Fall of 2018, including the blackface, "Negro Hill," and threatened shooter incidents described above. All of this has made F.B. fear her safety, feel disrespected, and has worsened her mental health.

155.   In February 2019, after realizing Defendant had no plans to celebrate Black History Month at her school, F.B. and several other African-American students saw an opportunity to educate their school community and bridge the racial divide between the students.

156.   On February 14, 2019, F.B. and five other students met with Principal Bach and the Intercultural Specialist, Madeleine Arenas to discuss their idea. During and following the meeting the following occurred:

    a.   Principal Bach ignored the student's concerns about racism at ISD 112 and later said he did not remember the students raising such concerns.

    b.   Principal Bach could not articulate any plans to celebrate Black History Month.

    c.   Principal Bach put the burden on F.B. and the other African-American students to propose a plan.

    d.   While Principal Bach and Ms. Arenas initially agreed to let F.B. and the other African-American students hang up posters featuring African-American leaders, Principal Bach and Ms. Arenas later prohibited F.B. and the other students from hanging posters featuring Huey P. Newton, the Black Lives Matter movement, Malcolm X, Emmett Till, and Tamir Rice.

    e.   Principal Bach said such posters would be too "controversial." Further, he told Mrs. Coleman something to the effect of "Malcolm X is too violent" and Ms. Arenas told F.B. it wouldn't send the community a nice message.

    f.   The administration would, however, agree to allow the students to put up

posters featuring Aretha Franklin, Ray Charles, Muhammad Ali, Michael Jordan, the Tuskegee Airmen, Coretta Scott King and the Obamas. In other words, the administration would only allow the students to present posters regarding parts of African-American history they found socially acceptable from their standpoint and censored the others.

g. F.B.'s mom, Tonya Coleman, subsequently spoke with Ms. Arenas, Dean Susana DeLeon, Principal Bach, and Superintendent Christopher. During the conversations, Mrs. Coleman was told, among other things, that (1) the school had to be careful what messages they were displaying; (2) "[w]e [the district] need to meet the community where they are;" and (3) some of F.B.'s posters could be perceived as controversial and might elicit a negative response from the students.

h. Principal Bach told Mrs. Coleman that the Black Lives Matter poster with Black Panthers could not be displayed because it would require dialogue in the classrooms first. Principal Bach also admitted to Mrs. Coleman that he had no idea whether the students were receiving Black History education or not. And, despite F.B. learning about Malcolm X in her class, Principal Bach told Mrs. Coleman that Malcolm X poster could not be displayed and said something to the effect of, "Well, you know…he's violent."

157. On March 1, 2019, F.B. and her peers participated in a peaceful protest during passing time, chanting "Black history uncensored!" The following occurred:

a. At the end of the hall, F.B. and her peers were met by white students holding

"All lives matter" signs.

b.  Some of the white students even followed F.B. and her African-American peers to class holding the "All lives matter" signs over their heads to intimidate them.

c.  The "All lives matter" sign violated the school handbook, which provides in part that "[o]nly posters . . . which promote school-sponsored activities, and are authorized and signed by the administration, may be displayed or distributed in the building."[7]

d.  Nothing was done to penalize the students that insisted on holding these signs inside the school.

e.  The Chaska Herald eventually published an article about the Black History Month Posters and the protest. Under the headline "School Response," the article stated Principal Bach said in an interview that , "the posters weren't censored, and administration asked the students to first put up the posters with more 'historical context,' before one with an explanation of 'Black Lives Matter.'" Principal Bach further stated, "We wouldn't censor somebody."

f.  Principal Bach's statement made F.B. and Mrs. Coleman appear as if they had lied and questioned their integrity.

_____

[7] Chaska High School Student & Parent Rights & Responsibility Handbook, 2018-2019, at p. 49, available at http://chs.district112.org/wp-content/uploads/sites/7/2018/08/Student-Handbook-18.19-1.pdf (last accessed on September 3, 2019).

158.    Notably, around the same time F.B. and her peers were working on the Black History posters for the school, two white students posted a picture of themselves on social media wearing a charcoal cosmetic mask and using a racist hashtag, "#blackface." The following occurred:

    a.    The post went viral and F.B. and several students called a meeting with Principal Bach, Dean DeLeon, and Dean Chuck Nelson, on or about February 19, 2019, regarding the impact this event in conjunction with all of the other racist events has had on them. In this meeting, students said things like they the felt unwelcomed and that they didn't feel safe.

    b.    As if to excuse the school's prior inappropriate responses, Dean DeLeon said something to the effect of, "[The white teachers] don't know what they don't know. [The white teachers] never experienced what we've experienced . . . Like Mr. Bach said, they are Caucasian people who lived in a farm with lots of white people and cows."

    c.    Dean DeLeon went on to say that it wasn't that white staff didn't want to help but that "they just don't know what they don't know."

159.    ISD 112 also ignored F.B.'s mental health concerns.

160.    F.B. was diagnosed with depression and anxiety while attending Chaska High School during her sophomore year.

161.    F.B. sought help from her school counselor, Katie LoScalzo, but her concerns were ignored.

162.    Specifically, Ms. LoScalzo discouraged F.B. from calling what F.B. was

experiencing as "depression" and never contacted F.B.'s mom even though F.B. requested for Ms. LoScalzo to do so.

163.    Despite the severity of F.B.'s situation, weeks went by without any follow-up from Ms. LoScalzo.

164.    F.B.'s depression and anxiety became more severe and she began cutting herself.

165.    F.B. ultimately confided in her mom and revealed she had met with the counselor but that Ms. LoScalzo minimized her concerns.

166.    Mrs. Coleman reached out to Ms. LoScalzo immediately and the counselor was very defensive.

167.    Mrs. Coleman asked her why she had not contacted her, and Ms. LoScalzo told her she made a case-by-case determination and simply decided not to do so.

168.    Thereafter, Mrs. Coleman reached out to Principal Bach regarding Ms. LoScalzo's conduct.

169.    Principal Bach showed no empathy or concern and instead began saying things like "we have a lot of kids here, and we need to make determinations" in an effort to excuse Ms. LoScalzo's behavior.

170.    Mrs. Coleman took steps to get F.B. private treatment. F.B. was diagnosed with depression and anxiety and prescribed medication and ongoing therapy.

171.    Mrs. Coleman told Principal Bach that neither he nor other administrators should meet with F.B. alone without Mrs. Coleman present.

172.    Nevertheless, Principal Bach disregarded this instruction repeatedly.

173.    On one occasion, Principal Bach called F.B. to his office alone and wrongly accused F.B. of having a romantic relationship with a male teacher.

174.    F.B. was taken back and proceeded to disclose to Principal Bach that she had depression and that the teacher in question was merely a support system for her.

175.    Unphased, Mr. Bach proceeded to say something to the effect of "You know that teacher is married and way older."

176.    F.B. was traumatized by this interaction, proceeded to hide in the bathroom after this meeting, and felt suicidal.

177.    F.B. was also hospitalized during the 2018-2019 school year due to severe anxiety, depression, and suicidal thoughts.

178.    Despite the pushback from other students and the administration, F.B. continued to advocate for racial equity by speaking publicly regarding racial discrimination within the district.

179.    F.B. also advocated at school for permission to start a group called "Voices Undivided" but was not permitted to do so.

180.    Through her interactions with Principal Bach, F.B. felt bullied and at times, afraid.

181.    Because of the discrimination and ISD 112's actions and repeated failure to remedy the racially hostile environment, F.B. will not be returning to ISD 112 for the 2019-2020 school year.

182.    Despite hostility from certain members of the community, Mrs. Coleman continues to advocate for racial equity within the district through her participation in

R.O.A.R and the Equity Advisory Counsel.

***D.J. – Current Student***

183.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

184.    D.J. recently completed her freshmen year at Chaska High School.

185.    During the 2018-2019 school year, D.J. also experienced racist conduct and witnessed the tension among students in the district, especially following the racially charged incidents described above.

186.    D.J. felt discouraged and uncomfortable at school because the school was aware of the racist conduct but did not do anything to meaningfully address it.

187.    In addition to these events, it was not uncommon for white students to make fun of the way she looked, such as saying her hair was "kinky."

188.    D.J.  was one of the students who met with Principal Bach to discuss Black History Month and whose ideas and posters were subsequently censored as discussed above.

189.    D.J., too, participated in the peaceful protest, chanting "Black history uncensored!" She, too, was followed to class by white students holding the "All lives matter" signs over their heads to intimidate them.

190.    Despite the pushback from other students, D.J. continued to advocate for racial equity by speaking publicly regarding racial discrimination within the district and attending school board meetings.

191.    D.J. also felt like she was treated differently by Dean DeLeon and Principal

Bach.

192.    On or about April 25, 2019, D.J. and approximately seven other African-American students met with Principal Bach and were crying in connection with the racist incidents that were happening at school and Principal Bach's treatment of them, which included repeatedly denying their reports of discrimination.

193.    In response to her advocacy and the advocacy of her African-American peers, white students mocked D.J. at school and on social media, saying things like "Y'all do realize it's a group of kids who want to be on Fox News so their friends think they're cool like come on."

194.    Her motives for speaking out were consistently questioned by her white peers and not taken seriously.

195.    Nevertheless, D.J. also continued to engage in discussion with administrators at Chaska High School during school hours in hopes of convincing them to take some meaningful action to put a stop once and for all to the racist conduct.

196.    D.J. also spoke out at a school board meeting on April 22, 2019, reiterating her concerns and some of the racist comments made to her while attending school in the district.

197.    For example, during her attendance at Pioneer Ridge one student said something to the effect of "Your owner wants you."

198.    D.J. was also called a "donkey."

199.    D.J. also told the school board that she was tired of having to wonder every day whether kids were going to ask her about her hair or whether they were going to harass

her.

200.    Furthermore, she noticed that when the African-American students reacted to the racist conduct, she and her peers of color would often be painted as the "bad guys."

201.    Notably, D.J. failed gym class for truancy when the reason for her absence was because she was meeting with school administration to discuss racist events at school.

202.    On information and belief, another student in her gym class was failing and the gym teacher allowed this student to write an essay in order to pass.

203.    Alternatively, D.J. was not allowed the opportunity to write an essay to pass gym.

204.    Additionally, in Spring 2019, D.J. and some peers expressed desire to be a part of a student group called "Voices Undivided."

205.    They were not permitted to do so, and instead, Dean DeLeon insisted D.J. join the student equity group even though D.J. did not want to join that group.

206.    D.J. is concerned the racial divide will not get better for the 2019-2020 school year and that some students continue to believe the racist conduct is acceptable since leadership has not taken any meaningful action to address it.

## C. Bluff Creek Elementary

### Z.P. – Former Student

207.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

208.    Z.P. is seven years old and attended Bluff Creek Elementary during the 2018-2019 school year.

209.    Mr. Peterson and Ms. Peterson ultimately removed Z.P. from the district after reported concerns over neglect of their son went unanswered by the district, their son was punched in the face twice, and Ms. Peterson was retaliated against by school personnel for reporting discrimination.

210.    Z.P. is on an IEP for cognitive functioning, speech, and occupational therapy. His IEP requires, in part, that a special education paraprofessional be available in his mainstream classes to assist and provide special accommodations.

211.    Shortly after starting school in District 112, Z.P.'s parents became aware of an alarming trend of utter disregard for their son's safety.

212.    For example, on October 1, 2018, Z.P. was sent home on the wrong bus despite being notified by his parents on September 24, 2018, that he needed to take an alternate bus for after school care.

213.    Because Z.P. was sent home on the wrong bus, he was left at home unsupervised 45 minutes after the bus dropped him off until his parents could return from work.

214.    Mr. Peterson and Ms. Peterson immediately contacted the school principal Joan McDonald regarding the error and were reassured this would not happen again.

215.    Despite these assurances, Z.P. was sent home a second time on the wrong bus on October 10, 2018. Again, Mr. and Ms. Peterson were contacted by Z.P.'s after school care, and not by the school that he did not arrive.

216.    Once Mr. Peterson and Ms. Peterson were notified by Z.P.'s after school childcare program that he did not arrive, it caused panic regarding his whereabouts.

217.   Mr. Peterson immediately drove home from work and found Z.P. at a neighbor's house playing outside.

218.   Ms. Peterson called the school principal regarding the incident on October 10, 2018, and she was very rude, alleging Ms. Peterson was being "too aggressive", and proceeded to hang up on her.

219.   Ms. Peterson and her husband met in person with the Superintendent and Principal on October 11, 2018, to discuss the incidents in question.

220.   At one point, Mr. Peterson slammed his fist on the table in frustration at the administration's utter disregard for his son's safety.

221.   Even though it was Mr. Peterson, a white male, who slammed his fist on the table, Principal Joan McDonald proceeded to look at Ms. Peterson (an African-American female) and said something to the effect of "Maybe if you weren't so aggressive, we could get this situation resolved."

222.   Following this interaction, Mr. and Ms. Peterson left the meeting feeling completely discouraged.

223.   Due to this discouragement, Ms. Peterson filed a complaint with the Minnesota Department of Education but unfortunately, the conduct for Z.P. only got worse.

224.   On November 19, 2018, Ms. Peterson arrived at Bluff Creek to bring her son a special birthday lunch. When she arrived, her son returned from recess with no coat on while all other students appeared to have a coat on.

225.   Notably, the students are generally outside for twenty minutes and on that day, it was about 23 degrees outside.

226.    Ms. Peterson asked her son why he did not have his coat on and before he could answer, another classmate said something to the effect of "he never does."

227.    Ms. Peterson also emailed Z.P.'s teacher, Kathy Williams, regarding why he did not have his coat on, and she alleged it was because she did not have time to double check.

228.    Ms. Peterson contacted the Minnesota Department of Education to share this additional neglect on November 19, 2018.

229.    Not only was Z.P. not cared for like the white students were because of race, he was also physically assaulted.

230.    Specifically, in December 2018, Z.P. was punched in the face on the school bus and told he "doesn't belong" on two separate occasions by white students.

231.    When Ms. Peterson discussed the incidents with Student Dean Jane Best, she asked whether the school had addressed racism with her students.

232.    Student Dean Jane Best said something to the effect of, "Are you kidding me? They are only in first grade!"

233.    Student Dean Jane Best could not fathom that the events affecting Z.P. could in fact be racially motivated simply because the students involved were in first grade.

234.    After getting nowhere with school administration, Ms. Peterson called school board member Lisa Anderson on December 18, 2018, and explained how her son had been discriminated against.

235.    Ms. Anderson began to cry and assured Ms. Peterson they would get a resolution to the situation. However, Ms. Anderson never followed-up.

236.    That same day Ms. Peterson got a call from Superintendent Clint Christopher due to Ms. Anderson's prompting. In that call, the Superintendent simply stated he heard she wanted to talk to him. He did not address not following up on her complaint or offer any empathy for the incidents happening within his district.

237.    During the call Ms. Peterson demanded her son get preferential seating in the front of the bus. Superintendent Clint Christopher obliged but claimed he could not guarantee it.  He said he would get approval from the transportation head and if the request was granted, she would get an email.

238.    Ms. Peterson did receive an email. However, the bus driver was never alerted to the approval and Mr. and Ms. Peterson had to advocate for the seating.

239.    In connection with the series of racially charged events within ISD 112, several parents and community members in Eastern Carver County School District, including Ms. Peterson, organized a group called "R.O.A.R." ("Residents Organizing Against Racism").

240.    In April 2019, Ms. Peterson started speaking to the media regarding her son's treatment in the district and was very active at school board meetings thereafter in hopes of bringing change to the district.

241.    Also, in April 2019, Ms. Peterson and other members of R.O.A.R., helped draft a petition demanding the district make changes.

242.    In May 2019, Ms. Peterson joined the newly constructed Equity Advisory Council to speak further to the district about the racial issues in the district.

243.    Additionally, in May 2019, an ISD 112 substitute teacher contacted Ms.

Peterson's employer and demanded she be fired in retaliation for her advocacy efforts.

244.    Nonetheless, Ms. Peterson continued to assist the district and hosted a solidarity training for the Superintendent and Assistant Superintendent.

245.    In June 2019, hostility in the community continued to rise leaving Ms. Peterson with no other choice than to step down from the district's Equity Advisory Council and become inactive in her efforts with R.O.A.R.

246.    The district never acknowledged the risk to Ms. Peterson's safety, or the safety of other families affected by racism.

247.    Considering the racial hostility directed towards her son and the district's failure to remedy the situation, Z.P. will not be returning to ISD 112 for the 2019-2020 school year.

### III.    Parents and the Community Demand Racial Equity.

248.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

249.    As a result of the systemic racism in ISD 112, a group of parents and community members, including Mrs. Coleman and Ms. Peterson, formed Residents Organizing Against Racism or R.O.A.R.

250.    Students and parents have been trying and continue to try to work with ISD 112 in an effort to combat the systemic racism and develop real solutions.

251.    Several parents and students, including many of the named plaintiffs and their parents, have attended board meetings and one-on-one meetings with district officials,

among other things, providing specific examples of racism within its schools and proposed solutions.

252.   On April 21, 2019, R.O.A.R. released a petition called "ISD112: It's Time to Act" which received approximately over 800 signatures.

253.   Defendant agreed to some but not all of the petition requests.

254.   For example, as part of the petition, R.O.A.R. asked for a change in leadership of Chaska High School.

255.   Nevertheless, on information and belief, Principal Bach will retain his position as Principal of Chaska High School for the 2019-2020 school year despite repeated complaints.

256.   Further, despite assurances from Defendant, upon information and belief, teachers have still not received appropriate training to address racism within the schools, and Defendant has not communicated an appropriate plan to combat racism for the 2019-2020 school year.

257.   Additionally, school board meetings continue to be heated and contentious.

258.   For example, after Mrs. Coleman spoke on behalf of R.O.A.R at the June 24, 2019, school board meeting, she was videotaped and followed out of the meeting by several white males in an effort to intimidate her. She and other parent advocates were further disparaged on a radio program in retaliation for their advocacy efforts.

259.   At a school board meeting on August 19, 2019, a community member reiterated to the school board that students were starting a new school year in a few weeks and will be coming back to an environment that was very tense when they left.

260.    This community member further reiterated that there is apparently still no transparent scorecard or accountability, that he heard teachers have not been trained or engaged over the summer, and that there is no coordinated plan for back to school.

261.    At this same school board meeting, there were women wearing "women who support Trump" t-shirts and making racist comments throughout this meeting.

262.    On August 20, 2019, Minnesota Attorney General Keith Ellison met with residents to discuss the racist events in District 112.

263.    At the meeting, Attorney General Ellison noted he was "extremely concerned" and advised attendees to write a letter telling him how concerned they were about what was going on in the district.

264.    A parent with students in the district and who is also a member of R.O.A.R said something to the effect of "After last year, which got to be really tense for a lot of students and parents and teachers, they had a huge opportunity to create an environment coming back to school this year, and I think they've dropped the ball."

265.    Following this community meeting, Defendant wrote a letter to Attorney General Ellison, dated August 26, 2019, outlining steps the district has allegedly taken in response to the incidents in question.

266.    This letter demonstrates Defendant, in fact, does not have a tangible plan in place to protect students during the 2019-2020 school year. By way of example:

> a) The district discussed training for "leadership" but fails to discuss or identify any training provided to teachers within its schools prior to the start of the new school year.

b) The district is allegedly performing an audit of policies, practices, and performance data, yet the results of this alleged audit will not be available until an unidentified date in September and the school year has already commenced.

c) The letter also implies that each school will be given discretion to develop their own equity goals and action plans "specific to their school communities" as opposed to the district providing clear direction and measures to ensure each of its schools are properly handling discriminatory conduct and reports of discrimination.

d) The letter also references development of a district equity action plan making plainly clear there is in fact no relevant and responsive equity plan to govern the 2019-2020 school year at this time.

267.   Finally, while the letter admits the district has "publicly acknowledged that we have major work to do in regard to racial equity, in particular," to date, the district has not provided actual, tangible plans to protect its students.

268.   What is more, in the past Defendant has repeatedly failed to properly utilize equity coordinators and human rights officers within its schools in dealing with race discrimination. Thus, even when it has a purported process in place, that process has failed, Defendant has not provided parents with information to allow them to effectively utilize

such processes to ensure their reports of discrimination are properly handled, and all of this call into question any future action referenced in the District's letter to the Attorney General.

269.    Despite repeated requests and ample notice of the systemic racism in District 112, Defendant has to date still not taken meaningful action to protect its students and remediate the rampant racism in its schools.

270.    Furthermore, any alleged *current* efforts by Defendant to address racism in District 112 does not eradicate its repeated failure throughout multiple school years to investigate complaints of race discrimination and adequately train their employees regarding properly handling race discrimination in its schools, despite repeated pleas from students, families, and community members.

271.    Defendant's repeated failure has resulted in widespread injury to Plaintiffs and students throughout the district.

## CAUSES OF ACTION

### COUNT I
42 U.S.C. § 1983
(*All Plaintiffs – Denial of Equal Protection, Race Discrimination and Failure to Train*)

272.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

273.    Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs have the right to equal access to an educational environment free from harassment and discrimination on the basis of race.

274.    At all relevant times, Defendant had unconstitutional customs, policies, or

practices of (a) failing to appropriately investigate and respond to reports of racial harassment and discrimination, including reports by Plaintiffs and their families; (b) failing to enforce its policies prohibiting discrimination and harassment when victims are African-American; and (c) failing to adequately train Defendant's administrators and employees on how to recognize, address, and prevent racial harassment and discrimination against its students.

275.   Defendant followed these unconstitutional customs, policies and practices not only with regard to Plaintiffs, but also with regard to racial harassment of other African-American at its schools.

276.   Defendant's unconstitutional customs, policies, or practices constituted disparate treatment of African-American based on their race, in violation of the Equal Protection Clause.

277.   Defendant's customs, policies, and practices for responding to reports of racial harassment and discrimination, including Plaintiffs' reports, were so clearly inadequate that they give rise to a reasonable inference that Defendant consciously acquiesced in the harassment and discrimination.

278.   Defendant violated Plaintiffs' right to equal protection of the laws on the basis of their race by acting with deliberate indifference to Plaintiffs' reports of racial harassment and discrimination, as well as to the racially hostile education environment Plaintiffs suffered because of Defendant's failure to take meaningful corrective action. Defendant's deliberate indifference included, without limitation:

a)  Ignoring or minimizing racial slurs repeatedly used by white students against

African-American students, including Plaintiffs;

b) Refusing to take meaningful action to address reports of race-based physical assaults against African-American students, including Plaintiffs;

c) Ignoring reports of racial harassment and discrimination made by students and parents on behalf of African-American students, including Plaintiffs;

d) Creating a hostile educational climate that tolerates racial harassment and discrimination, including bodily harm and the threat of the same to Plaintiffs and other African-American students;

e) Failing to appropriately discipline Caucasian students and staff who subjected Plaintiffs and other African-American students to racial harassment or discrimination;

f) Failing to take meaningful action to correct the conditions causing the racial harassment and discrimination and to prevent its recurrence; and

g) Failing to provide adequate training for its administrators and employees to prevent and address racial harassment and discrimination despite having notice that its procedures were inadequate and resulting in a violation of Plaintiffs' constitutional rights

279. Defendant's actions and decisions have deprived Plaintiffs of the privileges and immunities secured by the U.S. Constitution and laws, in violation of 42 U.S.C. § 1983.

280. As a direct and proximate result of Defendant's violation of Plaintiffs' equal protection rights under the Fourteenth Amendment, Plaintiffs have suffered and continue to suffer losses of educational opportunities and benefits, along with injuries, damages and

losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

281.   As a result of Defendant's equal protection violation, Plaintiffs are also entitled to their attorneys' fees and costs.

**COUNT II**
Title VI, 42 U.S.C. § 2000d
(*All Plaintiffs – Race Discrimination*)

282.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

283.   42 U.S.C. § 2000d, commonly referred to as Title VI, and its implementing regulations prohibit discrimination in a federally-funded school on the basis of a student's race.

284.   Specifically, 42 U.S.C. § 2000d provides that "No person in the United States shall, on the ground of race, color, or national origin, be exclude from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

285.   Defendant is a recipient of federal funds.

286.   Plaintiffs were subjected to harassment, discrimination, and disparate treatment on the basis of their race.

287.   Defendant had notice of the racial hostility occurring at ISD 112 schools. A number of incidents were reported to school administration. IDS 112 failed to take remedial measures to prevent further discrimination of the Plaintiffs and other African-American students allowing the behavior to continue and permeate throughout the school district.

288.    Racial hostility permeated (and continues to permeate) IDS 112 of such severity and pervasiveness as to significantly alter the conditions of each Plaintiff's educational environment resulting in physical attacks and injuries and thereby denying Plaintiffs equal access to the school's resources and opportunities.

289.    Defendant, despite actual knowledge and adequate opportunity to learn of this misconduct, failed to act to remedy the harassment, discrimination, and disparate treatment of Plaintiffs.

290.    As a direct result of the actions and conduct of Defendant, Plaintiffs suffered and continue to suffer emotional distress, loss of companionship, loss of educational opportunities, and other damages.

291.    As a result of Defendant's violation, Plaintiffs are also entitled to their attorneys' fees and costs.

### COUNT III
Minnesota Human Rights Act, Minn. Stat. § 363a.13
(*All Plaintiffs – Race Discrimination*)

292.    By reference hereto, Plaintiffs incorporate the preceding paragraphs by reference as if fully stated herein.

293.    Under the MHRA, "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race…." Minn. Stat. Ann. § 363A.13.

294.    As such, Defendant had a duty to provide Plaintiffs with an educational atmosphere free of race discrimination.

46

295.    Defendant failed to take adequate steps to provide Plaintiffs with an educational atmosphere free of race discrimination.

296.    As a result of Defendant's conduct, customs, policies, and practices, Plaintiffs were unjustly and discriminatorily deprived of equal education opportunities and benefits.

297.    As a direct result of the actions and conduct of Defendant, Plaintiffs suffered and continue to suffer emotional distress, loss of companionship, loss of educational opportunities, and other damages.

298.    As a result of Defendant's violation, Plaintiffs are also entitled to their attorneys' fees and costs.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request relief as follows:

A. For an Order adjudging the practices of Defendant complained of herein to be in violation of the rights guaranteed to Plaintiffs under Federal and Minnesota State law;

B. Issue a permanent injunction that directs Defendant to comply with Federal and State law;

C. Leave to add additional plaintiffs or claims by motion or any other method approved by the Court;

D. For an award to Plaintiffs against Defendant of all relief available under 42 U.S.C. § 1983, 42 U.S.C. § 2000d, and the Minnesota Human Rights Act, § 363A.01 *et seq.*, in amounts to be determined at trial, with interest on such amounts;

E. For an award of Plaintiffs' compensatory damages in an amount to be determined at trial for mental anguish, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due

process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of Defendant;

F.  For an award of punitive damages in an amount to be determined at trial;

G.  For an award to Plaintiffs of their attorney's fees, disbursements, and the costs of this action, and;

H.  For such other and further relief as the Court deems just and equitable.


Dated: September 3, 2019                NICHOLS KASTER, PLLP

                                        s/Anna P. Prakash
                                        Matthew H. Morgan, MN Bar No. 0304657
                                        Anna P. Prakash, MN Bar No. 0351362
                                        Laura A. Baures, MN Bar No. 0392081
                                        4600 IDS Center
                                        80 South 8th Street
                                        Minneapolis, MN 55402
                                        Telephone (612) 256-3200
                                        Fax (612) 338-4878
                                        morgan@nka.com
                                        aprakash@nka.com
                                        lbaures@nka.com

                                        Joshua A. Newville, MN Bar No. 0395221
                                        MADIA LAW LLC
                                        323 Washington Ave. N., #200
                                        Minneapolis, MN 55401
                                        Telephone (612) 349-2743
                                        Fax (612) 235-3357
                                        newville@madialaw.com

                                        ATTORNEYS FOR PLAINTIFFS