UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| T.B., a minor, by and through his parent and natural guardian, Ashley Bursch, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Independent School District 112, a/k/a Eastern Carver County Schools, <br><br> Defendant. | AMENDED MEMORANDUM OPINION AND ORDER <br> Case No. 19-cv-2414 (MJD/BRT) |

Matthew H. Morgan, Anna P. Prakash, Laura A. Baures, Melanie A. Johnson, Nichols Kaster, PLLP, and Joshua A. Newville, Madia Newville, LLC, Counsel for Plaintiffs.

Ellen A. Brinkman, Gordon Rees Sully Mansukhani, LLP, Courtney M. Blanchard, Erin S. Conlin, Nilan Johnson Lewis, P.A., Counsel for Defendant.

INTRODUCTION

This matter is before the Court on Defendant Independent School District 112, a/k/a Eastern Carver County Schools' ("ECCS") motions to exclude the expert testimony of Naomi Khalil and Mia Smith-Bynum (Doc. Nos. 224, 233) and on Plaintiffs' motion to exclude the expert testimony of David Wolowitz (Doc. 241).

I.  **Motion to Exclude Expert Opinion**

1

**A.     Standard**

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The role of trial courts is to serve as "gatekeepers to 'insure that the proffered expert testimony is both relevant and reliable.'"  Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006) (quoting Anderson v. Raymond Corp., 340 F.3d 520, 523 (8th Cir. 2003)).  In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court provided some general observations for the lower courts to consider in making determinations as to whether an expert's testimony is relevant and reliable, such as whether it has been tested, subjected to peer review

2

and publication, what is the known or potential rate of error, and whether it is generally accepted. 509 U.S. 579, 592-95 (1993).

In <u>Kumho Tire Company, Ltd. v. Carmichael</u>, the Court extended the <u>Daubert</u> reasoning to non-scientist experts stating:

> We conclude that <u>Daubert's</u> general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, 'establishes a standard of evidentiary reliability. It requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the the relevant discipline.

526 U.S. 137, 149 (1999) (cleaned up) (quoting <u>Daubert</u>, 509 U.S. at 590-92)).

When addressing the reliability factor, the Supreme Court has also held that "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).

Challenges to the factual basis of expert testimony go "to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine

3

the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Bonner v. ISP Tech, Inc., 259 F. 3d 924, 929-30 (8th Cir. 2001) (quoting Hose v. Chicago Northwestern Transp. Co., 70 F. 3d 968, 974 (8th Cir. 1996)).

### B. Mia Smith-Bynum

Smith-Bynum is a Professor of Family Science in the School of Public Health at the University of Maryland College Park. (Doc. 228 (Brinkman Decl.), Ex. 1 (Smith-Bynum Rep.) at 1.) She has a bachelor's degree in psychology with honors from the University of North Carolina-Chapel Hill and a master's degree and doctoral degree in clinical psychology from the University of Virginia. (Id.) She is a trained therapist with the skills necessary to evaluate and treat mental health problems in children, adults, and families and to diagnose the severe end of the mental health spectrum. (Id.)

Smith-Bynum has made scientific contributions in the following areas of study: (1) family communication about racial issues in both ethnic/racial minority families and white families; (2) health effects of racism on Black youth and adults; and (3) the psychological health effects of racial identity among ethnic

and racial minority children and adolescents. (Id.) In this case, Smith-Bynum has provided her opinions as to whether Plaintiffs' mental health struggles are linked to the racial harassment they experienced while attending ECCS schools.

To render her opinions in this matter, she interviewed both T.B. and J.F.R. T.B.'s mother and attorney were present during his interview, which lasted approximately one hour and 15 minutes. (Id. at App'x C.) During the interview, T.B. explained to Smith-Bynum his experiences with racial harassment at ECCS. (Id.) Smith-Bynum also asked a number of questions concerning family dynamics and how he identified racially – as he is from a biracial family. (Id.) Smith-Bynum also confirmed T.B. experienced several symptoms consistent with depression and anxiety, and that T.B. may have attempted suicide. (Id.)

Based on her interview of T.B., the review of T.B.'s medical records and school records, her experience and research, Smith-Bynum determined that "T.B.'s previous and current struggles with depression and anxiety are directly linked to the harassment he experienced in the school system. . . And while the sheer chronic natures of the harassment and threats to school safety are enough alone to render traumatic harm, the inaction and minimization by the school staff

5

and administrators have served to re-traumatize this student and his family." (Id. at 12.)

Smith-Bynum's interview of J.F.R. was also one hour and 15 minutes, which was attended by his parents and counsel. (Id. at App'x C.) During the interview, J.F.R. described his experiences of racial harassment and bullying at Pioneer Ridge Middle School and Chaska High School. (Id.) J.F.R. described the racial taunting during football practice his sophomore year as the worst of these experiences. (Id.) Smith-Bynum also asked J.F.R. whether he suffered symptoms of depression and anxiety, whether he had trouble sleeping, and whether he experienced chronic fatigue and low self-esteem. (Id.) J.F.R. confirmed other symptoms such as nervousness and tension, that he did not want to go to school, that he excessively worried and that seeing former classmates around town brings back traumatic memories. (Id.) Smith-Bynum also recognized that J.F.R.'s mental health struggles could be because of his complicated early psychosocial history (family troubles and adoption), but that in her opinion, J.F.R.'s experiences with racial harassment and bullying rendered their own distinct and harmful impact on his life. (Id.)

Based on her interview of J.F.R., the review of J.F.R.'s medical records and school records, her experience and research, Smith-Bynum determined that J.F.R.'s experiences of racial harassment and bullying resulted in J.F.R. not being able to perform academically to his full potential. (Id. at 16).) She also concluded that the impact of the egregious events suffered by J.F.R. damaged his sense of psychological agency and he suffered a profound loss of innocence during his years at ECCS. (Id.)

ECCS moves to exclude Smith-Bynum's expert testimony for a number of reasons: the opinions are based on insufficient facts and data; Smith-Bynum is not qualified to render a diagnosis as part of her report; she did not conduct a differential diagnosis; and her methodology is not an accepted methodology to issue an opinion on causation of medical conditions.

Plaintiffs note that Smith-Bynum did not purport to provide Plaintiffs with medical diagnoses. Instead, she provided an opinion on the consistency between the mental health issues Plaintiffs experienced after enduring racial discrimination based on academic research she and her colleagues have conducted. Plaintiffs argue her testimony is highly relevant to Plaintiffs' claims and will therefore be helpful to the factfinder. The average layperson is not an

7

expert on what constitutes racism, how racism should be addressed or the effects of different forms of racism on African American adolescents. Smith-Bynum's testimony will be helpful in answering these critical questions because she will explain why the incidents Plaintiffs experienced constituted severe and/or pervasive racism based on scientific research. (See id. at 11.) Plaintiffs further argue that trauma caused by subtle, but repeated racist incidents, is unlike physical injury or other types of psychological injury because of the dehumanization that racism entails. Smith-Bynum explains how racist incidents such as those experienced by Plaintiffs and the inadequate reactions to such incidents by school administrators have a proven and scientific effect on adolescent mental health. (Id. at 8, 13–14.)

Plaintiffs further argue that Smith-Bynum's testimony is based on reliable principles and methods, as they are based on scientific research into the connection between racism and mental health. In cases involving social sciences, where "the research, theories, and opinions cannot have the exactness of 'hard' science methodologies," the Court should look to other indicia of reliability, such as professional experience, education, training, and observations. Longoria v. Texas, Civ. No. 5:02-cv-112, 2007 WL 4618452, at *4 (E.D. Tex. May 18, 2007);

Arnold v. Cargill Inc., Civ. No. 01-cv-2086, 2006 WL 1716221, at *7 (D. Minn. June 20, 2006) (denying motion to exclude expert testimony because the fact that some social science research is inconsistent goes to the weight of the evidence, not its admissibility). Smith-Bynum's academic methods have been subjected to peer review and publication. Her theories linking racism and mental health issues are generally accepted within the field of psychology.

Finally, Smith-Bynum applied these methods to the facts of this case. Because she is not offering a medical diagnosis, she was not required to conduct a differential diagnosis on potential causes of Plaintiffs' mental health concerns. See Murphy v. Wheelock, Civ. No. 16-cv-2623, 2019 WL 3719035, at *8 (D. Minn. Aug. 7, 2019) ("The fact that [plaintiff's expert] does not offer a formal opinion on cost does not negate the overall helpfulness of his opinions with respect to the reasonableness of Plaintiffs' requested relief . . . [t]he Court resolves any doubts regarding the overall value of [the expert's] in favor of its admissibility.") (citation omitted). Even so, Plaintiffs argue that Smith-Bynum did consider the effects of preexisting medical conditions to the extent relevant to her opinion and determined, based on her professional experience as a clinical practitioner, supervisor and researcher, that Plaintiffs' preexisting medical conditions would

9

not negate the experiences of racial harassment and bullying, which are widely understood to have a negative impact on a child's mental health and stress levels. (Doc. 228 (Brinkman Decl.), Ex. 1 (Smith-Bynum Rep.) at App'x C; Doc. 280 (Johnson Decl.), Ex. A (Smith-Bynum Dep.) at 191.)

Based on the above, the Court agrees that Smith-Bynum's testimony is relevant and will be helpful to the jury in this case. She is clearly qualified to render the opinions included in her report, and any challenges to the factual bases of her opinions go to the weight of the testimony, not its admissibility.

### C. Naomi Khalil

Khalil is an Educational Consultant and owner of Creating Fires for Justice, LLC., through which she advocates for issues of equity in school districts. (Doc. 236 (Brinkman Decl.), Ex. 1 (Khalil Dep.) at 71–72.) She holds a bachelor's degree from the University of Michigan, and a master's and educational specialist's degrees from Wayne State University. (Id., Ex. 2 (Khalil Rep.) at 4.) She taught for 6 years, was a school administrator for 7 years, and a district administrator for 13 years. (Id.) Currently, Khalil is the Deputy Executive Director of Equity, Advocacy and Civil Rights for the Detroit Public Schools Community District, and in this role she leads district diversity initiatives,

employee compliance with civil rights laws, grants coordinator, a MTSS (multi-tiered system of support) district coordinator, stakeholder advocacy projects and district strategic planning.  (Id.)   As an educational equity expert, Khalil was retained by Plaintiffs' counsel to render an opinion on "whether ECCS failed in its educational duty to provide a school climate free of racial discrimination and harassment for its Black students."  (Id.)  To do so, she examined T.B.'s and J.F.R.'s claims and "address[ed] why ECCS's lack of swift and decisive response failed to support and protect these students, neglected to provide an environment of cultural inclusivity, violated their own policies that call for accountability of staff to policies and practices, and was clearly unreasonable."  (Id.)

In her report, Khalil opines that it is paramount for schools to continually create an inclusive environment and have proper implementation of their policies.  (Id. at 6–9.)  Policies and practices are only as effective as their implementation, so they must be well-communicated, disseminated, and enforced.  (Id. at 9–12.)  Khalil also opines that schools should address racial bullying and should strive to follow their policies and commit to having accountability measures.  (Id. at 13–20.)  Khalil found that ECCS's policies,

11

practices, and training did not meaningfully address racial bullying and harassment. (Id. at 21–23.) She further concluded that ECCS did not enforce policies to achieve equity to help maintain an environment free from racial bullying, and that the school's lack of implementation and enforcement was a significant contributing cause to the harm alleged by Plaintiffs. (Id. at 24–28.)

ECCS moves to exclude Khalil's expert testimony for two reasons: Khalil's expert testimony is based on an erroneous legal standard and is therefore irrelevant and unhelpful to the jury; and Khalil's reports and opinions are not supported by sound methodology. (Doc. 235 at 6–10.)

To demonstrate that Khalil's testimony is based on an erroneous legal standard, ECCS points to Khalil's assertion in her report that "ECCS's dereliction of duty to address racial bullying and harassment . . . created an environment ripe with racial behaviors that were complicity supported by ECCS staff." (Doc. 236 (Brinkman Decl.), Ex. 2 (Khalil Rep.) at 28.) ECCS argues this is not a negligence case, therefore, there is no legal "duty" at issue. Instead, the issue is whether ECCS acted with deliberate indifference to the harassment and bullying that took place, which requires a showing that ECCS acted with intent. Khalil's report does not address the deliberate indifference standard. ECCS also takes

12

issue with Khalil's use of "best practices" and the term "perfection" when she noted in her deposition that schools should aim for perfection in the application of their policies. (Doc. 282 (Prakash Decl.), Ex. A (Khalil Dep.) at 159–61.)

The Court agrees that because the applicable standard is deliberate indifference, any discussion of an "educational duty" may confuse the jury. Khalil repeatedly references ECCS's "duties" to students, therefore Khalil is precluded from testifying as to a legal duty with regard to whether ECCS's response to reports of harassment and bullying were clearly unreasonable.

ECCS's remaining challenges to Khalil's testimony, such as her use of the terms "best practices" and "perfection" go to the weight of her testimony, not its admissibility. See Murphy, 2019 WL 3719035, at *8.

ECCS also argues that Khalil mentions no specific theory or technique used for the many opinions she has articulated. As a result, there is little proof that her methods of evaluation have been or can be tested. ECCS argues that, while she articulates her experience and some widely accepted principles such as inclusivity, she does little more than assert she is an expert and that she knows best.

13

The Court finds that Khalil's testimony is not "so fundamentally unsupported" as to be excluded. See Bonner, 259 F.3d at 929–30. Again, because Khalil's opinions concern "social sciences" the Court looks to other indicia of reliability, such as professional experience, education, training and observations. Longoria, 2007 WL 4618452, at *4. Khalil has over twenty years' experience in the educational field concerning equity issues. In addition, she references numerous peer-reviewed articles, scholarly texts, and statistics from the U.S. government. Accordingly, her testimony is admissible.

### D.   David Wolowitz

Wolowitz is a senior director in the law firm McLane Middleton, P.A. and he is licensed and actively practicing law in New Hampshire and Massachusetts. (Doc. 246 (Johnson Decl.), Ex. B (Wolowitz Rep.) at 1.) He received an A.B. from Washington University in 1968, an M.A. from Harvard University in 1971, and his J.D. from the University of Michigan in 1975. (Id.)

Since 1990, he has advised schools on a variety of issues, including policy review, employment issues, compliance and all aspects of student safeguarding. (Id. at 2.) He has conducted and supervised many investigations of misconduct by students and teachers reported to constitute bullying, harassment and

discrimination, and has trained administrators on how to conduct such investigations. (Id.) He currently consults with schools and other youth-serving organizations ("YSOs") on child safeguarding practices and has conducted audits of policies and practices relating to child safeguarding. (Id.)

He has served as an expert witness for plaintiffs and defendants in multiple cases nationally, in state and federal courts, with regard to issues relating to the standard of care for public and private schools and other YSOs to safeguard children in a variety of settings. (Id. at 3.) The cases have involved issues relating to the standard of care including adequacy of policies and procedures relating to bullying and harassment and has provided expert opinions on whether the actions of the schools and their employees were reasonable under the circumstances. (Id.)

In this case, Wolowitz was retained by ECCS to provide an expert opinion on the adequacy of policies and practices of ECCS relating to the prevention of and response to bullying, harassment and discrimination with respect to the claims asserted by T.B. and J.F.R. (Id. at 1.) Based on his review of the pleadings, documents, depositions and exhibits, Wolowitz concluded, *inter alia,* that ECCS's policies contained the key elements for such policies and were reasonable and

appropriate to address bullying, harassment and discrimination. (Id. at 18.) He further concluded it was his opinion that ECCS's training and education with regard to preventing and responding to bullying, harassment and discrimination were reasonable and appropriate. (Id.) He further opined that ECCS did not act with deliberate indifference to the reports of bullying, harassment and discrimination of T.B. (Id. at 19.)

With regard to J.F.R.'s claims, Wolowitz came to similar conclusions, and opined that ECCS did not act with deliberate indifference to the reports of bullying, harassment, and discrimination from J.F.R. and his parents. (Id. at 41.)

Plaintiffs raise a number of challenges to Wolowitz's expert testimony, including that his opinions provide no insight or observation that a layperson could not draw for themselves. (Doc. 244 at 8–10.) Plaintiffs further argue there are analytical gaps in Wolowitz's opinions and that he does not have the relevant background to reliably opine on whether a school district was deliberately indifferent to race discrimination. (Id. at 11–12.) Plaintiffs further argue that Wolowitz has improperly provided legal opinions as to whether ECCS acted with "deliberate indifference." (Id. at 12–15.)

As to the last argument, Plaintiffs argue the phrase "deliberate indifference" is improper because it is a statement of legal conclusion that invades the Court's domain. (Id. at 13.) The Court agrees. Ordinarily, an expert's testimony is not defective simply because it utilizes the words of a legal standard. United States v. Eagle, 318 F.3d 785, 792 (8th Cir. 2003). An expert may "express his opinion on the ultimate jury question" in some circumstances. Id. But the Court must scrutinize such testimony closely because the use of legal phrases in testimony concerning the ultimate issue in a case presents an appreciable risk of juror confusion. Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995); Mace v. Johnson, Civ. No. 11-cv-477 (MJD/LIB), 2014 WL 538580, at *8–*9 (D. Minn. Feb. 11, 2014). The Court determines that the risk of juror confusion is sufficiently severe in this case to warrant precluding Wolowitz from using the phrase "deliberate indifference" at trial.

As to the remaining challenges, the Court finds that Wolowitz is more than qualified to provide an opinion as to whether ECCS acted reasonably in response to known acts of discrimination that occurred under ECCS's control. He has served as an expert witness in eighteen cases. (Doc. 275 (Brinkman Decl.), Ex. 1 at 2–3.) Plaintiffs cite two instances in which Wolowitz's testimony was

17

excluded, but those cases are distinguishable.  The California state case was a bench trial, and the court held Wolowitz's opinion would not assist him as the trier of fact.  More importantly, the court acknowledged Wolowitz's testimony could be helpful to a jury and acknowledged case law that would permit attorneys to testify in their areas of expertise.  (Doc. 246 (Johnson Decl.), Ex. C (<u>Los Angeles Unified Sch. Dist. v. Ace Property Casualty</u>, Minute Order No. BC593234 at 3–4, (Cal. Super. Ct., November 23, 2020).)  In <u>Thomsen v. Kefalas</u>, Civ. No. 15-cv-2668, 2018 WL 1508735, at *18 (S.D.N.Y. Mar. 26, 2018), the court, in deciding a legal issue at summary judgment, declined to rely on Wolowitz's declaration in which he provided an expert opinion as to the interpretation and application of relevant laws.  Here, Wolowitz is not providing an opinion on law, he is providing an opinion on the factual question of whether ECCS acted reasonably.

     Wolowitz has decades of experience advising and counseling schools on issues related to bullying, harassment, and discrimination, and has attended trainings, and presented trainings on these matters.  Thus, Wolowitz's testimony will address, based on his experience, the adequacy and the reasonableness of ECCS's policies and practices, and will aid the trier of fact in understanding the

scope of a school's ability to address and respond to alleged peer bullying, harassment, and discrimination.

Moreover, Plaintiffs and their parents will be offering their own subjective opinion testimony to the jury about the alleged inadequacies in ECCS's policies and responses to their allegations. ECCS has the right to put on a defense to such allegations by relying on the decades of relevant experience of its outside expert.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Exclude the Expert Testimony of Mia Smith-Bynum (Doc. 224) is **DENIED**.

2. Defendant's Motion to Exclude the Expert Testimony of Naomi Khalil (Doc. 233) is **GRANTED** to the extent Khalil is precluded from testifying as to a legal duty owed by ECCS to students and **DENIED** in all other respects; and

3. Plaintiffs' Motion to Exclude the Expert Testimony of David Wolowitz (Doc. 241) is **GRANTED** to the extent Wolowitz is precluded from using the phrase "deliberate indifference" at trial and **DENIED** in all other respects.

Dated:  August 4, 2022                    s/ Michael J. Davis
                                          Michael J. Davis
                                          United States District Court