# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| T.B., a minor, by and through his parent and natural guardian, Ashley Bursch, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Independent School District 112, a/k/a Eastern Carver County Schools,<br><br>    Defendant. | **AMENDED MEMORANDUM OPINION AND ORDER**<br>Case No. 19-cv-2414 (MJD/BRT) |

Matthew H. Morgan, Anna P. Prakash, Laura A. Baures, Melanie A. Johnson, Nichols Kaster, PLLP, and Joshua A. Newville, Madia Newville, LLC, Counsel for Plaintiffs.

Ellen A. Brinkman, Gordon Rees Sully Mansukhani, LLP, Courtney M. Blanchard, Erin S. Conlin, Nilan Johnson Lewis, P.A., Counsel for Defendant.

## INTRODUCTION

This matter is before the Court on Defendant Independent School District 112 a/k/a Eastern Carver County Schools' ("ECCS" or "the District") Motion for Summary Judgment. (Doc. No. 242.) Plaintiffs T.B., a minor, by and through his parent and guardian, Ashley Bursch ("T.B.") and Jquan Fuller-Rueschman, by and through his guardians, David and Dennis Fuller-Rueschman ("J.F.R.")

1

oppose the Motion (T.B. and J.F.R. are collectively referred to herein as "Plaintiffs").

Six current and former African American students from schools within the District initially filed this lawsuit alleging their schools allowed race discrimination against African American students to go unchecked for years. After four Plaintiffs settled or dismissed their claims, and the Court's entry of a negotiated consent decree binding the District, only Plaintiffs T.B. and J.F.R.'s claims remain. The District now moves for summary judgment seeking dismissal of T.B. and J.F.R.'s cases without a trial. T.B. and J.F.R. oppose the District's Motion.

T.B. and J.F.R. each assert three claims against the District for violations of state and federal law, including Title VI of the Civil Rights Act of 1964, the Minnesota Human Rights Act, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. T.B. and J.F.R. allege the District violated their rights by, among other things, maintaining a hostile environment for African American students within its schools, failing to adequately respond to reports of race discrimination, and failing to provide school staff with proper training on how to respond to incidents of race discrimination.

As discussed in more detail below, the legal elements T.B. and J.F.R. must prove at trial to succeed on each of their claims are similar.  At this procedural stage, however, the Court's only task is to determine whether T.B. and J.F.R. have sufficient evidence to advance their claims to trial.  Because the Court finds that T.B. and J.F.R. have presented sufficient evidence to create factual questions as to whether the District violated their civil rights, the Court will allow T.B. and J.F.R. to present their cases to a jury at trial.  Accordingly, the District's Motion for Summary Judgment is denied.

## BACKGROUND

Defendant ECCS includes eight elementary schools, three middle schools, three high schools, and has more than 9,000 students enrolled each year.  (Doc. 156 (Haga Decl.), ¶¶ 3–4.)  These schools are in or around Chaska, Chanhassen, Carver, and Victoria, Minnesota.  (Id.)  ECCS has approximately 1,350 employees, including 720 teachers.  (Id. at ¶ 5.)

Plaintiff T.B. attended Chaska Middle School East ("CMSE") during sixth through eighth grade, from February 2017 to May 2019.  Plaintiff J.F.R. attended Pioneer Ridge Middle School ("PRMS") and then Chaska High School ("CHS") from 2012 to October 2018.

During T.B. and J.F.R.'s time at ECCS, ECCS had policies concerning harassment and bullying that addressed racial discrimination.  (Doc. 250 (Brinkman Decl.), Ex. 1; Ex. 2.)  These policies describe steps to be taken to investigate reports of harassment and bullying.  (Id., Ex. 1 at 5–6; Ex. 2 at 8–9.)  These steps include specific timeframes for certain actions, allow for interim measures to prevent continued misconduct, describe disciplinary actions to be taken, and provide template forms to assist staff in documenting investigations.  (Id.; see also id., Ex. 2 at ISD003487.)  ECCS's policies include training requirements, which include establishing a regular training cycle for employees and volunteers, ongoing professional development, providing annual information to students regarding bullying, and implementing programs to prevent or reduce policy violations.  (Id., Ex. 1 at 6–8; Ex. 2 at 11–12.)  ECCS required staff to complete training on these policies on an annual basis.  (Id., Ex. 3 at 25–26.)

Despite these policies and training, Plaintiffs point to evidence that African American students at ECCS experienced a racially hostile environment at school.  Plaintiffs point to a lengthy list of racially charged incidents over a period of more than five years at ECCS schools, including and in addition to incidents that

directly involved T.B. and J.F.R.  (Doc. 272 at 4–13 (listing 72 separate incidents from 2015 to 2020).)

Generally, Plaintiffs claim that ECCS's response to these incidents was inadequate and displayed a deliberate disregard for reports of racial harassment within its schools.  Plaintiffs point to annual surveys of students and parents, which informed ECCS that a number of students did not believe students from diverse backgrounds got along well in school.  (Doc. 273 (Johnson Decl.), Ex. 76 at ll. 72–80; Ex. 79 at ISD009077.)  These surveys include requests from students and their parents asking the district to better address discriminatory behavior among students and staff.  (Id., Ex. 76 at ll. 1109, 1157, 1278, 1281, 1290, 1322; Ex. 77 at line 93; Ex. 79 at ISD009077.)  Plaintiffs further argue ECCS minimized its problem with racial harassment, framing such incidents as inevitable and "teachable" moments.  (Doc. 272 at 14.)

### A.    Plaintiff T.B.'s Allegations of Racial Harassment

T.B. transferred to CMSE in February 2017.  (Doc. 250 (Brinkman Decl.), Ex. 13.)  Plaintiffs assert that within the first month of T.B. attending CMSE, a white student called T.B. the N-word.  (Id., Ex. 24 at ISD006364.)  ECCS points to its internal records, however, which state T.B. may have called the white student "kracker" and other names first.  (Id.)

Plaintiffs further assert that for years, beginning in the 6th grade, school leaders failed to intervene when white students continually called T.B. "Danimal"—a racial slur referencing a cartoon monkey found on yogurt containers provided to students at T.B.'s school—despite T.B.'s regular reporting of this harassment. (Doc. 273 (Johnson Decl.), Ex. 6 at 46–50, 53–54, 63, 69, 74–77; Ex. 8 at 13, 34; Ex. 21 at 27–29; Ex. 12 at 19, 23-24.) ECCS claims that school administrators did tell students not to use the term against T.B. and disciplined some students who did. (Id., Ex. 12 at 22–25, 108–109.)

Plaintiffs assert T.B. was often called "Danimal" in gym class. (Id., Ex. 6 at 63; Ex. 21 at 26–27.) In one instance, Plaintiffs assert students called T.B. "Danimal" while others laughed, and that in response, a school administrator merely "talked to" the responsible students and did not discipline them. (Id., Ex. 12 at 18–25, 105–06.) On other occasions, students pushed T.B. and called him "Danimal" on the bus and mockingly handed him a cartoon of Danimal yogurt. (Id., Ex. 6 at 68–69, 79–80; Ex. 21 at 28.) T.B. alleges that after months of reporting the harassment to school staff, and with no results, he became disillusioned and suffered retaliation from students for reporting the behavior. (Id., Ex. 6 at 60–62 (T.B. testifying that a student kicked him and called him a "snitch").)

Plaintiffs further allege that a white student took T.B.'s laptop and stomped on it, and that the school tried to make T.B. pay for the computer.  (Id., Ex. 5 at 44–45; Ex. 6 at 70–71.)  ECCS disputes the allegation that the school tried to make T.B. pay for the computer.

In February 2018, a white student with a history of racially harassing T.B. mocked him about body odor and when T.B. got upset, the teacher sent T.B., not the aggressor, out of the classroom.  (Id., Ex. 12 at 115–117.)  ECCS claims that staff disciplined the student who made the remarks and that the teacher was merely following T.B.'s individual education plan ("IEP"), which provided that if T.B. got frustrated, he should be given a break.  (Id.; Doc. 245 at 37.)

Plaintiffs also allege that when a student grabbed T.B.'s neck and ripped his shirt, a school administrator told T.B.'s mother that the student rarely got into trouble and that the student's parents were willing to pay for the shirt.  (Doc. 273 (Johnson Decl.), Ex. 5 at 39; Ex. 6 at 81–84.)  T.B.'s mother took this to be an attempt to overlook the district's policy on assault because it was T.B. who was the victim.  (Id., Ex. 5 at 41–42.)

In March 2018, Plaintiffs allege T.B. found racial slurs and other inappropriate drawings on his binder, but that the students who drew the

images were again not disciplined for this behavior.  (Id., Ex. 6 at 109–111; Ex. 21 at 59–60.)

In December 2018, T.B. found that someone had written the N-word across his gym shirt while it was in his gym locker, including the words "[N-word] LEAVE NOW."  (Id., Ex. 5 at 129; Ex. 6 at 87–102, 222; Ex. 8 at 21–23; Ex. 12 at 146, 157–158; Ex. 21 at 125–128; Ex. 108; see also Doc. 174 (Johnson Decl.), Ex. YY.)  Plaintiffs allege the school's handling of the incident demonstrates a continuation of its pattern of attempting to minimize or ignore the racial harassment T.B. was encountering at CMSE.  (Doc. 272 at 29–30.)  For example, when an assistant principal first reported the incident to T.B.'s mother, he spent a considerable amount of space in his email discussing minor issues with T.B.'s cleanliness in the locker room before mentioning the T-shirt incident near the end of his email.  (Doc. 273 (Johnson Decl.), Ex. 104.)  Plaintiffs also claim the investigation into this incident immediately focused on determining if T.B. was the one who wrote the racial slurs on his own shirt, instead of focusing on evidence suggesting other potential culprits.  (Doc. 272 at 29–30.)  T.B. alleges he faced more harassment when he returned to school following the incident, including an incident involving his bus driver, which Plaintiffs also claim ECCS

failed to investigate or address. (Doc. 273 (Johnson Decl.), Ex. 5 at 218–219; Ex. 6

at 191–194; Ex. 14 at 70–71, 100–102; Ex. 21 at 98–99; Ex. 24 at 20–22; Ex. 110.)

Plaintiffs allege T.B. experienced several other, similar incidents of racial

harassment during his time at CMSE as well. T.B. left ECCS in June 2019. (Doc.

272 at 24–32.)

### B.    Plaintiff J.F.R.'s Allegations of Harassment

Plaintiffs claim that J.F.R. was also subjected to racial harassment for years

while he attended two schools within ECCS, Pioneer Ridge Middle School and

Chaska High School. (Doc. 272 at 33–41.) During middle school, J.F.R. alleges

students regularly made racist "jokes" about him by calling him "Fat Albert,"

saying he was very intimidating, telling him he did not know how to swim, and

stating that he liked Kool-Aid and watermelons. (Doc. 273 (Johnson Decl.), Ex.

11 at 77–79, 81–82.) J.F.R.'s parents reported these incidents to school officials.

(Id., Ex. 131.)

In high school, Plaintiffs allege students regularly called J.F.R. the N-word.

In one instance, J.F.R. alleges a student called him the N-word and when J.F.R.

told him to stop, the teacher scolded J.F.R. for "disrupting" class and did not

believe J.F.R. that he had just been called the offensive term. (Id., Ex. 11 at 108–

10.) This same student harassed J.F.R. on other occasions, including by stealing

J.F.R.'s phone and headphones, throwing paper at him, ruining his shoes, and pushing him.  (Id. at 107–08.)

J.F.R. talked to the principal about the harassment, but J.F.R. claims, like T.B., that this only made the harassment worse.  (Id. at 47, 112.)  J.F.R.'s parents also reported the bullying J.F.R. was experiencing to CHS, but they allege the school did not investigate at least some of their reports.  (Id., Ex. 2 at 36, 52; Ex. 20 at 47; Ex. 112; Ex. 113.)  They also argue that the investigations the school did conduct proceeded too slowly.  (Doc. 272 at 59–60.)

Plaintiffs further allege school staff blamed J.F.R. for other students' misconduct.  (Doc. 272 at 34.)  For example, Plaintiffs allege the school wrongly suspended J.F.R. and gave him a week of lunch detention after another student punched him.  (Doc. 273 (Johnson Decl.), Ex. 11 at 47–48, 52–54.)  ECCS disputes this allegation and points to its internal records regarding the incident, which state that J.F.R. started the fight.  (Doc. 250 (Brinkman Decl.), Ex. 30 at ISD020074.)

In the summer before his sophomore year of high school, J.F.R. joined the football team as one of just three African American players on the team.  (Doc. 273 (Johnson Decl.), Ex. 11 at 125–26.)  J.F.R. alleges he was subjected to

additional harassment while on the team, including other students calling him the N-word and threatening him. (Id. at 114–15, 120–21, 126–27.) Again, J.F.R. claims that when he tried to report these and other similar incidents to his coaches and other school staff, they either ignored him or subjected him to discipline, including forcing him to sit out one game. (Id. at 121–23, 127, 132, 136.)

J.F.R.'s parents eventually requested a meeting with his coaches and the athletic director about the harassment J.F.R. was experiencing on the football team. (Doc. 250 (Brinkman Decl.), Ex. 38.) The meeting took place on October 5, 2016. (Id.) J.F.R.'s parents submitted a bullying incident report to the school after the meeting, in which they noted that J.F.R. had just decided to quit the football team and they feared his depression would worsen. (Id., Ex. 39.)

On the day a school administrator began investigating the bullying incident report, October 12, 2016, the school suspended J.F.R. for his involvement in a fight, which J.F.R. claims a white student instigated by calling him the N-word. (Id., Ex. 32 at ISD021373; Ex. 40 at 68; Doc. 273 (Johnson Decl.), Ex. 11 at 229–32.) A school administrator reported the fight to police and J.F.R. was

charged with assault.  (Doc. 250 (Brinkman Decl.), Ex. 33.)  The other student was

suspended for one day.  (Doc. 273 (Johnson Decl.), Ex. 118 at ISD022541.)

The school prepared a formal report in response to the bullying incident

report J.F.R.'s parents submitted after the October 5, 2016 meeting.  (Id., Ex. 119.)

In the report, a school administrator described several interviews with J.F.R.'s

family, teammates, and coaches.  (Id. at 3.)  The report concluded that the

incident that had prompted the investigation was a "Non-Bullying Incident" and

that J.F.R. was partly to blame for instigating altercations with his teammates.

(Id. at 1, 3.)  The report further notes that the school disciplined four players by

calling their parents and that a conversation with the football team was held to

discuss the incident.  (Id.)

On January 31, 2017, a school dean circulated a Violent Behavior Report

about J.F.R. to his teachers, to put them on notice of the October 12, 2016 fight

involving J.F.R.  (Doc. 250 (Brinkman Decl.), Ex. 36.)  The Violent Behavior

Report also described intervention strategies for J.F.R.  (Id.)  The school

circulated the same report to J.F.R.'s teachers the following school year even

though Plaintiffs claim this was not required.  (Doc. 273 (Johnson Decl.), Ex. 120.)

J.F.R. was also assessed by the school psychologist and placed on a behavioral intervention plan.  (<u>Id.</u>, Ex. 2 at 117–20; Ex. 10 at 139–40.)

J.F.R. again tried to play football in his senior year of high school.  (<u>Id.</u>, Ex. 11 at 152–53, 158.)  J.F.R. claims he decided to rejoin the team because his car was scratched multiple times, including at school, and students threw eggs at his house.  (<u>Id.</u>, Ex. 2 at 165–66; Ex. 11 at 152–53, 158–59, 202–03.)  He believed it would put an end to the harassment if he rejoined the team.  (<u>Id.</u>, Ex. 11 at 152–53.)

The school held meetings with staff before J.F.R. rejoined the team.  (Doc. 250 (Brinkman Decl.), Ex. 26 at 207–08.)  The school claims it offered J.F.R. additional assistance from one of the school's paraprofessionals to help support him on the team, but J.F.R. declined this suggestion.  (<u>Id.</u>, Ex. 26 at 208; Ex. 29 at 61.)  The school also implemented another behavioral intervention plan for J.F.R. while he played on the team.  (<u>Id.</u>, Ex. 50.)

On September 5, 2018, one of J.F.R.'s parents reported to the school that a teammate had been pushing J.F.R. and calling him the N-word in an attempt to start a fight.  (Doc. 273 (Johnson Decl.), Ex. 121.)  A school official investigated the report but did not complete a Bullying Investigation Report even though

Plaintiffs claim this was required.  (Id., Ex. 22 at 100–01; Doc. 272 at 39.)  A few

days after this incident, one of J.F.R.'s parents reported to the school that J.F.R.'s

coach had responded by pulling J.F.R. aside in the locker room and telling "him

that he misses too much practice and that he needs to stop getting into

arguments with other people."  (Doc. 250 (Brinkman Decl.), Ex. 45.)

On September 14, 2018, three students attended the CHS homecoming

football game in blackface and Afro-style wigs.  (Doc. 273 (Johnson Decl.), Ex. 9

at 91.)  It appears J.F.R. was not at this game because he had quit the football

team a few days before.  (Doc. 290 (Brinkman Decl.), Ex. 56 at 172.)  In response

to the blackface incident, ECCS sent an email to parents condemning the

behavior and stating that it would address the situation with the responsible

students and their families.  (Id., Ex. 57.)  But Plaintiffs point out that a picture of

the students in blackface at the game was later printed in the CHS yearbook.

(Doc. 273 (Johnson Decl.), Ex. 1 at 76–79; Ex. 10 at 203–04.)

In the fall of 2018, shortly after the blackface incident, J.F.R. and his parents

met with school administrators about transferring J.F.R. to a different school.

(Doc. 250 (Brinkman Decl.), Ex. 26 at 243, 276; Ex. 29 at 199; Ex. 46.)  J.F.R. claims

his parents discussed the harassment he had experienced with the administrators

at the meeting, and their belief that the school had not done enough to protect

J.F.R.  (Doc. 273 (Johnson Decl.), Ex. 11 at 214–15.)  Plaintiffs allege the school

principal responded to these comments by slamming his fist on the table and

yelling "prove it."  (Id. at 214.)

After this meeting, J.F.R. withdrew from CHS and graduated on time from

another school.  (Id. at 28; Doc. 250 (Brinkman Decl.), Ex. 47.)  Plaintiffs claim that

after J.F.R. withdrew, two white students used J.F.R.'s photo in a racist image

they were circulating in the school via social media entitled "Negro Hill."  (Doc.

272 at 40; Doc. 290 (Brinkman Decl.), Ex. 58 at 213–14; Ex. 59.)  ECCS claims it

responded to this incident by conducting an investigation, reaching out to

affected students and their families, disciplining responsible students, and

continuing equity work.  (Id., Ex. 59.)

Plaintiffs allege J.F.R. experienced other, similar incidents of racial

harassment in addition to those described above during his time at PRMS and

CHS.  (See Doc. 272 at 33–41.)

## SUMMARY JUDGMENT

Summary judgment is appropriate if there are no disputed issues of

material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Enter. Bank, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its

resolution affects the outcome of the case." <u>Amini v. City of Minneapolis</u>, 643

F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson</u>, 477 U.S. at 248, 252).

Plaintiffs assert claims against ECCS for race-based discriminatory conduct

under Title VI of the Civil Rights Act of 1964, the Minnesota Human Rights Act,

and the Equal Protection Clause of the United States Constitution.  ECCS moves

for summary judgment on each of these claims.

## DISCUSSION

### A.    Title VI and the MHRA

Title VI of the Civil Rights Act of 1964 prohibits race discrimination in any

program receiving federal funds:

> No person in the United States shall, on the ground of race, color, or
> national origin, be excluded from participation in, be denied the
> benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance.

42 U.S.C. § 2000d.  Private parties may sue under Title VI for intentional

discrimination.  <u>Alexander v. Sandoval</u>, 532 U.S. 275, 279–81 (2001).  The MHRA

provides, in relevant part, that: "It is an unfair discriminatory practice to

discriminate in any manner in the full utilization of or benefit from any

educational institution, or the services rendered thereby to any person because of

race . . ."  Minn. Stat. § 363A.13, subd. 1.

"The MHRA is typically construed in accordance with federal precedent concerning analogous federal statutes."  Verrett v. Indep. Sch. Dist. #625, Civ. No. 18-2513 (DSD/BRT), 2019 WL 2870076, at *4 (D. Minn. July 3, 2019) (quoting Mumid v. Abraham Lincoln High School, 618 F.3d 789, 793 (8th Cir. 2010)); see also Brantley ex rel. Brantley v. Indep. Sch. Dist. No. 625, 936 F. Supp. 649, 657 n.16 (D. Minn. 1996) (citation omitted).  Courts, therefore, apply the Title VI standard to race discrimination claims brought under both Title VI and the MHRA.  See id.

To succeed on a Title VI claim, a plaintiff must show that a defendant's discriminatory conduct was intentional and motivated by race, color, or national origin.  Alexander, 532 U.S. at 280 (noting that it is "beyond dispute" that Title VI "prohibits only intentional discrimination"); Thompson ex rel. Buckhanon v. Bd. of Spec. Sch. Dist. No. 1, 144 F.3d 574, 581 (8th Cir. 1998); Bryant v. Indep. Sch. Dist. No. 1-38 of Garvin County, OK, 334 F.3d 928, 931 (10th Cir. 2003)  If there is no direct evidence of intentional discrimination, a plaintiff may establish a prima facie case of discrimination under Title VI through circumstantial evidence that gives rise to an inference of discrimination based on race, color, or national

18

origin.  See Rowles v. Curators of Univ. of Mo., 983 F.3d 345, 355 (8th Cir. 2020);

Lucke v. Solvsig, 912 F.3d 1084, 1087 (8th Cir. 2019).

To prove intentional discrimination in violation of Title VI based on a

"hostile environment," a plaintiff must show "the defendant was '(1) deliberately

indifferent, (2) to known acts of discrimination, (3) which occurred under its

control.'"  Verrett, 2019 WL 2870076, at *4 (quoting Shrum ex rel. Kelly v. Kluck,

249 F.3d 773, 782 (8th Cir. 2001)).  Deliberate indifference will depend on the

school's response to the harassment.  A school's response to an allegation of

discriminatory conduct may not be "clearly unreasonable in light of the known

circumstances."  K.R. ex rel. Proctor v. Duluth Pub. Sch. Acad., Civ. No. 19-999

(DWF/LIB), 2022 WL 2154970, at *7 (D. Minn. Mar. 16, 2022) (quoting Davis ex

rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999)).

In addition, the discriminatory acts must be "so severe, pervasive, and

objectively offensive that it effectively bars the victim's access to an educational

opportunity or benefit."  Davis, 526 U.S. at 633.[1]  A student is deprived of access

---

[1] While Davis is a Title IX case, the United States Supreme Court has "interpreted
Title IX consistently with Title VI."  Barnes v. Gorman, 536 U.S. 181, 185 (2002);
see also, e.g., Zeno v. Pine Plains Cent. School Dist., 702 F.3d 655, 665 (2d Cir.
2012) (applying "severe, pervasive, and objectively offensive" standard in Title
VI case).

to an "educational opportunity or benefit" whenever a discriminatory act restricts them "'in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the school system."  Zeno, 702 F.3d at 666 (quoting 34 C.F.R. § 100.3(b)(1)(iv)). "Educational benefits include an academic environment free from racial hostility."  Id. (citing Hayut v. State University of New York, 352 F.3d 733, 750 (2d Cir. 2003)).

A plaintiff must also show the school had actual knowledge of a risk of harassment to succeed on a Title VI claim.  Id.  ("In addition, a school district must know of the harassment.  Constructive knowledge is not enough; only actual knowledge is a predicate to liability.");  K.T. v. Culver-Stockton Coll., 865 F.3d 1054, 1058 (8th Cir. 2017) ("a plaintiff must allege that the funding recipient had prior notice of a substantial risk of peer harassment") (emphasis in original); Doe v. Indep. Sch. Dist. 31, Civ. No. 20-226, 2020 WL 4735503, at *12 (D. Minn. Aug. 14, 2020) (recognizing same actual knowledge requirement in Title IX case). "Actual knowledge can be demonstrated when an appropriate person—one who has authority to address the alleged discrimination and institute corrective

measures—has prior notice of a substantial risk of harassment based on previous incidents." <u>K.R. ex rel. Proctor</u>, 2022 WL 2154970, at *7 (citations omitted).

Plaintiffs argue the MHRA does not incorporate Title VI's heightened notice standard of actual knowledge, but rather only requires a plaintiff to show a school had constructive knowledge of an alleged hostile environment. (Doc. 272 at 45.) Plaintiffs also argue the MHRA only requires them to show that the acts of discrimination they experienced were "severe <u>or</u> pervasive," not "severe <u>and</u> pervasive" as required for their Title VI claim. (<u>Id.</u> at 51.) As discussed further below, the Court need not resolve these disputes at this juncture because it finds the Plaintiffs have presented sufficient evidence for the purposes of this Motion to satisfy Title VI's arguably heightened standards. The Court will address these issues again, if necessary, during the discussion of proper jury instructions at the time of trial.

Finally, to be actionable, the school's "deliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse." <u>Shrum</u>, 249 F.3d at 782 (citing <u>Davis</u>, 526 U.S. at 645).

Plaintiffs argue their Title VI and MHRA claims are supported by two separate theories of liability, which they refer to as "hostile environment" and

21

"peer harassment" claims. (Doc. 272 at 2, 43.) The cases on which Plaintiffs rely,

however, do not differentiate between these two theories in terms of the

elements Plaintiffs must satisfy to show intentional discrimination in violation of

Title VI and the MHRA. <u>See, e.g.</u>, <u>Verrett</u>, 2019 WL 2870076, at *4 (applying same

standard to all Title VI claims); <u>Pruitt v. Anderson</u>, Civ. No. 11-2143 (DSD/JJK),

2011 WL 6141084, at *2 (D. Minn. Dec. 9, 2011) (same); <u>T.C. ex rel. S.C. v. Metro.</u>

<u>Gov't of Nashville</u>, 378 F. Supp. 3d 651, 681 (M.D. Tenn. 2019) (similar, Title IX

case), <u>vacated sub nom. In re Metro. Gov't of Nashville & Davidson Cnty.</u>, Civ.

No. 19-0508, 2020 WL 13283436 (6th Cir. Jan. 24, 2020). Accordingly, the Court

will apply the same standard described above in analyzing all of Plaintiffs' Title

VI and MHRA claims.

### 1.     T.B.'s Title VI and MHRA Claims

Plaintiffs assert ECCS discriminated against T.B. by subjecting him to a

racially hostile environment and by failing to respond appropriately to specific

incidents of racial harassment T.B. encountered while attending CMSE from 2017

to 2019. In support, Plaintiffs point to evidence that students harassed T.B.

throughout middle school by calling him racial slurs, including the N-word, and

comparing him to a cartoon monkey found on yogurt containers the school

provided.  The record also includes reports of other students kicking and
pushing T.B., including in retaliation for his attempts to report the racial
harassment he was facing in school.  Other students vandalized T.B.'s belongings
by drawing the same type of offensive terms on his clothing, binder, and laptop.
These acts culminated in T.B. finding "[N-word] LEAVE NOW" drawn on his
gym shirt.

Based on this record, Plaintiffs have presented sufficient evidence to create
a factual question as to whether the racial harassment T.B. faced throughout
middle school was "severe, pervasive, and objectively offensive," such that it
"effectively bar[red] [T.B.'s] access to an educational opportunity or benefit."
Davis, 526 U.S. at 633.

ECCS points to mitigating evidence that suggests T.B. may have instigated
some of the fights in which he was involved.  ECCS also argues that some
students may not have understood the racial connotations of the terms they were
using against T.B.  ECCS may present this mitigating evidence at trial, but it does
not show that the harassment T.B. suffered was merely non-actionable "teasing
and name-calling among school children."  Id. at 652.  To the contrary, on this
record, a reasonable jury could determine that the harassment T.B. faced was

"severe and pervasive" enough to deny him educational opportunities and benefits, including the benefit of "an academic environment free from racial hostility."  <u>Zeno</u>, 702 F.3d at 666.  T.B. also missed school after the gym shirt incident and he argues the environment at CMSE drove him from the District altogether.  (Doc. 272 at 50.)

ECCS further argues that some of the incidents involving T.B. occurred outside of school, citing an incident in which T.B. received offensive social media messages.  (Doc. 245 at 33.)  But it appears beyond dispute that most of the incidents T.B. reported occurred on school property during school hours.  Therefore, Plaintiffs have satisfied the requirement that the discriminatory conduct at issue take place under the school's "control."  <u>Verrett</u>, 2019 WL 2870076, at *4.

Plaintiffs also satisfy the "actual knowledge" requirement with regard to T.B.'s claims given that many of the incidents involving T.B. are documented in the school's own records.  <u>K.R. ex rel. Proctor</u>, 2022 WL 2154970, at *7.  T.B.'s mother reported several incidents to the school and school administrators testified to receiving these reports.  These administrators had "authority to address the alleged discrimination and institute corrective measures."  <u>Id.</u>

ECCS argues the Court should not consider the lengthy list of racially charged incidents that Plaintiffs allege took place at ECCS schools from 2015 to 2020 in determining whether T.B. faced a racially hostile environment at CMSE, at least to the extent these other incidents did not directly involve T.B.  ECCS argues Plaintiffs cannot rely on this evidence to show that T.B. faced a hostile environment at his school because there is no evidence T.B. knew about all of these other discriminatory incidents.  The Court observes that resolving this issue at this procedural stage is also unnecessary given that there is sufficient evidence of incidents that <u>did</u> directly involve T.B. to create jury questions over his Title VI and MHRA claims.

The parties most vigorous dispute with regard to T.B. concerns whether his school's responses to his reports of racial harassment were "clearly unreasonable in light of the known circumstances."  <u>Davis</u>, 526 U.S. at 648.  ECCS claims it investigated each incident of alleged bullying or harassment involving T.B. and followed up with the students involved, including disciplining responsible students.  Plaintiffs argue these responses were unreasonable and usually involved merely "talking to" the responsible students.  <u>See</u> <u>Theno v.</u> <u>Tonganoxie Unified Sch. Dist No. 464</u>, 377 F. Supp. 2d 952, 966 (D. Kan. 2005)

25

(denying summary judgment where "the school rarely took any disciplinary measures above and beyond merely talking to and warning the harassers"). Plaintiffs claim the school failed to make sufficient efforts to prevent students from calling T.B. racial slurs like "Danimal," instigating fights with him, and vandalizing his belongings with racial epithets over a period of multiple years. They claim the school's responses to these incidents were inadequate and reflect a pattern of minimizing the harassment T.B. faced or blaming T.B. for the actions of others.

The parties' arguments as to whether CMSE's responses to these incidents were "clearly unreasonable" relate to factual questions and credibility determinations that must be presented to a jury. <u>Id.</u> The Court cannot decide whether ECCS's responses were clearly unreasonable as a matter of law at this stage.

The Court finds that fact issues remain as to whether ECCS subjected T.B. to a hostile environment or failed to respond appropriately to specific incidents of peer harassment in which he was involved. The record contains sufficient evidence for T.B.'s Title VI and MHRA claims to proceed.

### 2.    J.F.R.'s Title VI and MHRA Claims

The analysis of J.F.R.'s Title VI and MHRA claims at this stage is similar. Plaintiffs allege J.F.R. faced racial harassment throughout middle and high school until he eventually withdrew from the District during his senior year of high school.

The harassment began in middle school where J.F.R. alleges he was regularly the target of racially derogatory remarks. J.F.R. also provides evidence that he repeatedly tried to play football as one of less than a handful of African American players on the team, only to be met with racial slurs, physical bullying, and disparate discipline. When J.F.R. left the team, he faced similar harassment from other students and his car was vandalized at school. The evidence regarding incidents like these, which J.F.R. experienced in school and during school-sponsored activities like football, is sufficient to create factual questions as to whether J.F.R. was denied educational benefits because of "severe, pervasive, and objectively offensive" race-based harassment that occurred under his schools' control. Verrett, 2019 WL 2870076, at *4.

Further, the incidents described above that directly involved J.F.R. are enough to create factual questions regarding this severity element without

resorting to the many reported incidents of racial harassment at ECCS that did not involve J.F.R.  (See Doc 272 at 45.)

Similarly, because many of the incidents on which Plaintiffs rely to support J.F.R.'s Title VI claim are documented in his schools' own records, Plaintiffs have shown that J.F.R.'s schools had "actual knowledge" for the purposes of this Motion.  K.R. ex rel. Proctor, 2022 WL 2154970, at *7.

As with T.B.'s claims, the core of the parties' dispute with regard to J.F.R.'s Title VI and MHRA claims center on whether ECCS's responses to incidents of racial harassment involving J.F.R. were "clearly unreasonable in light of the known circumstances."  Davis, 526 U.S. at 648.

Plaintiffs allege J.F.R.'s teachers and other school officials allowed the racial harassment to continue for years by failing to investigate and follow up on incidents of racist taunting and by failing to discipline responsible students in any meaningful way.  (Doc. 272 at 59–60.)  They also allege J.F.R. was regularly subjected to disproportionate discipline for his involvement in these incidents. For example, Plaintiffs point to an incident in which they claim a white student provoked a fight by calling J.F.R. the N-word.  The white student was suspended for a day while J.F.R. was referred to police and charged with assault.  In another

instance, Plaintiffs allege that when J.F.R. and his parents tried to discuss the

harassment with school officials at a meeting, the school's principal responded

by yelling "prove it" at them.

ECCS, on the other hand, claims it made many attempts to protect J.F.R.

The District argues school officials held meetings with J.F.R. and his parents,

conducted an investigation of a Bullying Incident Report that J.F.R.'s parents

submitted, offered him additional support from a paraprofessional, and more.

As with the mitigating evidence ECCS presents regarding T.B.'s claims, ECCS

may present this evidence concerning J.F.R.'s claims to the jury.  Viewing the

record as a whole and drawing reasonable inferences in Plaintiffs' favor,

however, the Court cannot determine at this juncture that ECCS's responses

concerning J.F.R. were not "clearly unreasonable" as a matter of law.  Davis, 526

U.S. at 648.  This is especially true in light of the "known circumstances" of a

years-long history of documented reports of J.F.R. being the victim of racially

charged harassment at two schools within the District.  Id.

As with T.B., whether ECCS subjected J.F.R. to a hostile environment or

failed to respond appropriately to specific incidents of peer harassment

involving him in violation of Title VI and the MHRA are questions for a jury to decide.

**B.     Section 1983—Equal Protection**

42 U.S.C. § 1983 provides a private right of action allowing individuals to sue state officials who, under color of state law, subject them to the deprivation of any rights, privileges or immunities secured by federal law.  Where, as here, plaintiffs seek to impose liability for violations of a constitutional right on a local government body via § 1983, they "must show that there is an official policy or a widespread custom or practice of unconstitutional conduct that caused the deprivation of a constitutional right."  Marksmeier v. Davie, 622 F.3d 896, 902 (8th Cir. 2010) (citing Monell v. Dept. of Social Servs., 436 U.S. 658, 690–91 (1978)); see also Artis v. Francis Howell North Band Booster Ass'n, Inc., 161 F.3d 1178, 1181–82 (8th Cir. 1998) ("For the School District to be liable, [plaintiff] must prove that the School District had an official policy or widespread custom that violated the law and caused his injury.").  The relevant custom or practice of unconstitutional conduct must be "so widespread as to have the force of law." Bd. of Cnty. Commrs. v. Brown, 520 U.S. 397, 404 (1997) (citing Monell, 436 U.S. at 690).

Plaintiffs seek to impose liability on ECCS via § 1983 for violating their rights under the Equal Protection Clause of the Fourteenth Amendment.  The Clause prohibits a public school from "deny[ing] . . . any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Plaintiffs allege ECCS violated their Equal Protection rights by maintaining a widespread custom of "deliberate indifference" to racial harassment in its schools.  (Doc. 272 at 3, 61–65.)  Specifically, Plaintiffs allege ECCS was deliberately indifferent in two ways: (1) by maintaining a "custom of inaction" in response to discriminatory incidents within its schools; and (2) by adopting inadequate training practices that caused Plaintiffs' constitutional injuries.  (Id.)

As a threshold matter, ECCS argues both of Plaintiffs' Equal Protection claims fail as a matter of law due to a lack of "comparator" evidence.  (Doc. 245 at 44; Doc. 288 at 18.)  In support, ECCS relies on Harper v. Madison Metro. Sch. Dist., 110 Fed. App'x 684 (7th Cir. 2004) and Klinger v. Dept. of Corrections, 31 F.3d 727 (8th Cir. 1994).  In both cases, courts dismissed plaintiffs' Equal Protection claims because the plaintiffs attempted to demonstrate unequal treatment by comparing themselves to other parties who were not "similarly situated."  Harper, 110 Fed. App'x at 687; Klinger, 31 F.3d at 729, 731.

As the Ninth Circuit Court of Appeals recently noted, however,

> The existence of a comparator is not a prerequisite to stating a
> disparate treatment claim under the Fourteenth Amendment.  To the
> contrary, comparator evidence in disparate treatment claims can, but
> need not, be used to support a finding of a discriminatory motive.  It
> is not a gatekeeping mechanism essential to plaintiffs' ability to
> prove that they have been denied equal protection of the laws by
> being adversely treated on the basis of membership in a protected
> class.

Ballou v. McElvain, 29 F.4th 413, 426 (9th Cir. 2022) (citing Trans World Airlines,

Inc. v. Thurston, 469 U.S. 111, 121 (1985)).  The Ninth Circuit's analysis is

consistent with precedents from both the Supreme Court and the Eighth Circuit.

See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266–

67 (1977) (describing various methods for proving discrimination in violation of

the Equal Protection Clause); Thompson v. Sch. Dist. of Omaha, 623 F.2d 46, 48–

49 (8th Cir. 1980) (finding plaintiff established prima facie case on Equal

Protection claim without comparator evidence).  In any event, the record in this

case includes incidents in which T.B. and J.F.R. allege they were treated less

favorably than white students in terms of the punishments T.B. and J.F.R.

received.  Accordingly, ECCS's argument that Plaintiffs' Equal Protection claims

fail at the outset due to a lack of comparator evidence is incorrect.

The analysis of Plaintiffs' first Equal Protection claim—that ECCS maintained a custom of inaction in response to racial harassment—is similar to the analysis of Plaintiffs' Title VI claim. Verrett, 2019 WL 2870076, at *4 ("Title VI and Fourteenth Amendment Equal Protection Clause claims are coextensive and are analyzed under the same analytical framework.") (citing United States v. Fordice, 505 U.S. 717, 732 n.7 (1992)). Therefore, because the Court has already determined that fact issues remain as to Plaintiffs' Title VI and MHRA claims, this first portion of Plaintiffs' Equal Protection claims similarly survives.

Plaintiffs' second Equal Protection claim—failure to train—requires a different showing. A school district may be held liable on a § 1983 failure-to-train claim when (1) its training practices are inadequate; (2) it was deliberately indifferent to the rights of others in adopting the training practices, such that the failure to train reflects a deliberate or conscious choice; and (3) the deficient training caused a plaintiff's injury. Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (citations omitted).

Construing all facts and reasonable inferences in Plaintiffs' favor, the Court finds that factual questions also remain as to Plaintiffs' failure-to-train claim. ECCS argues annual trainings on its policies that included anti-racism

33

components was sufficient.  But Plaintiffs argue this frequency was plainly inadequate given the frequent, serious incidents of racial harassment that occurred within ECCS schools over a number of years.  (See Doc. 272 at 4–13.)

Further, Plaintiffs argue staff did not follow the policies taught during these annual trainings, pointing to instances in which they argue ECCS staff failed to fill out required reports, failed to consistently investigate reports of racial harassment, and failed to report such harassment to school administrators. They argue that, even if staff did investigate, the investigations were too slow, the school's trainings did not teach staff "basic measures" on how to conduct these investigations properly, and the trainings did not teach staff how to support victims of racial harassment, like T.B. and J.F.R.  (Doc. 272 at 64.)  They point to evidence that teachers and bus drivers voiced concerns about the lack of training or how to address incidents of racism.  (Doc. 273 (Johnson Decl.), Ex. 90 at ISD014397; Ex. 91 at ISD005501–02.)

Based on this record, the Court finds that the issue of whether inadequate training "caused" the constitutional injuries Plaintiffs allege involves factual determinations that also must be left to the jury.

34

**ORDER**

Based upon the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED** that:

Defendant's Motion for Summary Judgment (Doc. 242) is **DENIED.**

Dated:  <u>August 4, 2022</u>                     <u>s/ Michael J. Davis      </u>
                                                Michael J. Davis
                                                United States District Court